Peelle, Ch. J.,
delivered the opinion of the court:
The Government by motion seeks a new trial on the assigned ground of error of fact and of law, and also asks that *499 Findings X and XI be amended in certain particulars. We will, therefore, review the case.
This action arises out of delays of the Government and for deductions as liquidated damages from the contract price for delays of the claimant in the performance of contracts in the construction of a pumping plant to be operated by electricity for dry docks at the navy yard in New York and for extra and additional work.
The original contract was entered into through the Chief of the Bureau of Yards and Docks September 15, 1900, whereby the claimant agreed, for the consideration of $79,435, to furnish all necessary labor and materials and to complete within seven calendar months, in accordance with the plans and specifications made part of the contract, a pumping plant for Dry Dock No. 3 at the New York Navy Yard.
In accordance with the contract the claimant began work and after it had excavated for the pump pit, driven some piles in and around same, made drawings for the pumps and motors necessary to install the plant, the Navy Department concluded to connect Dry Dock No. 2 with Dry Dock No. 3 and to build a single pumping plant for both docks to be operated wholly by electricity. To this end a supplemental contract (A) was entered into, whereby the claimant, for the additional consideration of $42,885, agreed to furnish all necessary labor and materials to carry out the changes so agreed upon and to complete the same on or before October 15, 1901, to which date the original contract was extended.
After the date agreed upon for the completion of the work under the' original and supplemental contracts and while the work thereunder was progressing, the claimant, on February 16, 1903. entered into a second supplemental contract (B) with the United States, whereby the claimant agreed to construct three hatches in the roof of the pump well for the additional sum of $959.80, nothing being said therein as to the tim,e of the completion of the work or as to delays under prior contracts.
During the progress of the work a controversy arose between the claimant and the civil engineer in charge as to the method of designing and constructing the floor of the *500 pump well and also as to tbe requirement of the specifications respecting the construction of the suction chamber, which disagreement resulted in the appointment of a board by the Chief of the Bureau of Yards and Docks to consider changes in the bottom of the pump well and the compensation to Be paid therefor. The board reported that the work had been done by the claimant in accordance with the specifications and that it was chargeable with no improper work or procedure. The board estimated the increased cost of the new work at $6,708.05, for the doing of which a third supplemental contract (C) was entered into March 7, 1903, in which no mention was made as to the time of completion of either the original or supplemental contracts nor as to the subject of delays prior thereto.
By reason of the changes so made by the Government and the use of the dock for docking vessels, as set forth in Finding YII, the claimant was delayed in getting the work ready for the installation of the machinery until May 1, 1903, during which time the claimant incurred extra expenses of superintendence and maintenance of the plant amounting to $3,000, for which amount, being due to the delays of the Government, the claimant is entitled to recover.
During the period from May 1, 1903, to April 21, 1904, when the plant was completed ready for tests, the claimant unreasonably delayed the work, as set forth in Finding VIII, for about 210 days, by reason of which the Government was damaged, if measured by the liquida ted-damage clause of the contract, $5,250; otherwise there is no evidence as to the actual damage sustained; and if only actual damages are recoverable then the claimant is entitled to recover the whole amount of the deduction, $6,000; otherwise $750, the difference between said deduction and the amount found by the court, as set forth in Finding VIII.
And in respect of this branch of the case the claimant’s contention is that, as the work was not completed within the extended contract time by reason of the delays of the Government, and no other time was fixed in the second or subsequent supplemental contracts, the time limit was thereby waived, and the claimant was therefore entitled to. a reasonable time within which to do the work; and if not *501 done within a reasonable time and the Government was thereby damaged, then actual damages only can be recovered, to be shown by evidence independent of the provision of the liquidated-damage clause of the contract. In support of this contention the claimant cites the cases of District of Columbia v. The Camden Iron Works (181 U. S., 453), King v. United States (37 C. Cls., 428), United States ex rel. The International Contracting Co. v. Lamont (155 U. S., 303), and United States v. Gleason (175 U. S., 588, 609).
That the claimant was, for the reasons stated, entitled to a reasonable time within which to do the work is in effect conceded by the defendants, but they insist that the liquidated-damage clause of the contract was continued in force and furnishes the measure of damages without other proof.
The provision of the contract, being paragraph 12 of the specifications relied upon, provides:
“Damage for delay. — In case the work is not completed within the time specified in the contract, or the time allowed by the Chief of the Bureau of Yards and Docks under paragraph 11 of this specification, it is distinctly understood and agreed that reductions at the rate of $25 per day shall be made from the contract price for each and every calendar day after and exclusive of the date within which completion was required up to and including the date of completion and acceptance of the work, said sum being specifically agreed upon as the measure of damage to the United States by reason of delay in the completion of the work; and the contractor shall agree and consent that the contract price, reduced by the aggregate_ of damages so deducted, shall be accepted in full satisfaction for all work done under the contract.”
It is true that as a general rule the courts — not regarding forfeitures with favor — incline to construe the damage clause of contracts, where not clearly expressed otherwise, as a penalty where the same can be accurately ascertained.
The sum so specifically agreed upon in the paragraph of the specifications quoted as the measure of damages, it is therein provided, shall be deducted from the contract price, and the amount so reduced “ shall be accepted in full satisfaction for all work done under the contract.” While neither the word “ penalty ” nor “ liquidated ” damages is mentioned *502 in the contract, the intention of the parties, from a fair construction of the language, is clear. (Globe Refining Company v. Landa Cotton Oil Company, 190 U. S., 540; Sun Printing and Publishing Co. v. Moore, 183 U. S., 642.)
But from the tenor of the claimant’s argument we infer that no question would be raised as to the character of the damages had it failed through its own fault to complete the work within the extended contract time. The contention is, as before stated, that the work not having been completed within a reasonable time the loss to the Government, if any, became a penalty, subject to proof as to the actual damages sustained.
Now, did the Government by its conceded delays in preventing the completion of the work within the contract time thereby waive the time limit so as to disable itself from thereafter claiming the benefit of the liquidated-damage clause of the contract for failure to perform within a reasonable time ? That is to say, within a reasonable time measured by the circumstances existing at the date the contract time ceased. (Lyle Shipping Co. v. Cardiff Corporation (1900), 2 Q. B., 638.)
In view of the insistence of counsel for the Government that the decision in this case is “ so clearly and emphatically a reversal of all previous decisions of this court,” we will review, among others, the decisions to which he refers.
Counsel for the Government contends that the cases of the Distinct of Columbia v. The Camden Iron Works (181 U. S., 453) and Ittner v. United States (43 C. Cls., 336) are not applicable, because the claimants in those cases were prevented from performance by the Government and thereafter they completed the work within a reasonable time.
However, in the case of the District of Columbia v. The Camden Iron Works (supra, p. 464) the court ruled that where strict performance was prevented or waived there could be no recovery for fines or penalties for delay or failure.
In the Ittner ease (43 C. Cls., 336) the claimant, by reason of the delay of the Government in signing the contract, was •unable to complete the work within the contract time, and in his request that the time limit be waived agreed that, if *503 granted, “ all other provisions of the contract shall remain in force ” and that he would complete the work within 90 days’ additional time. The engineer in charge recommended the approval of his application, but he was allowed a reasonable time and within that time he completed the work, and yet liquidated damages were deducted as though the time limit had not been waived. The claimant recovered judgment in this court for the whole amount of such deduction, from which judgment no appeal was taken. This case has since been followed by the Comptroller of the Treasury. (14 Comp. Dec., 819, 824; 15 Comp. Dec., 362, 368.) These decisions also are in line with Hudson on Building and Engineering Contracts (3d ed. vol. 1, p. 524), and cases there cited.
In the Ellicott Machine Co. case (43 C. Cls., 232) the claimant had failed to complete the work within the contract time, and the only question was whether the contract provided for liquidated damages; and the court held that it did, and hence no proof otherwise of the amount of such damages was necessary.
In the case of United States v. Bethlehem Steel Co. (205 U. S., 105) the claimant had made four bids based on different dates of delivery, the highest bid being for the shortest time, and on failure to deliver agreed that there should be deducted an amount per day equivalent to the difference between the short and the long time for delivery. The court construed the language as evidence that time was of the essence of the contract and that therefore the amount so stipulated to be deducted was liquidated damages and that as the claimant had failed to perform within the agreed time the amount was properly deducted though credit was given to the claimant for the delays subsequently caused by the Government. Hence, independently of the agreed damages, to have held otherwise would have been giving the contractor the highest price for the longer time in delivery, contrary to its bid.
Besides, the delay in performance was mainly and in the first instance caused by the claimant, and being in default when the delays of the Government occurred he was in no condition to say that its delays had prevented him from per *504 formance within the contract time, though it had delayed him from performance thereafter, for which he was entitled to credit.
It was doubtless for this reason that the question whether the time limit had been waived was not raised, and hence the date from which to assess damages was not eliminated, though the period for which damages could be assessed was shortened by the delay of the Government, leaving the single question whether the language of the contract could be construed as liquidated damages or a penalty.
The court therein refers to the case of the Sun Printing & Publishing Association v. Moore (183 U. S., 642). There the question was as to the payment by a charter party of a sum agreed upon as the value of a vessel if he failed to return it. The question of time was not essentially involved, and therefore the amount to be paid was rather in the nature of a covenant giving the charter party the election to return or not, and if not to pay the value agreed upon and not some other value. (Smith v. Bergengren, 153 Mass., 236.)
True the vessel was wrecked and lost, but, says the court, “ the risk was hence cast upon him of loss, even be it without his fault,” so the price of the vessel, the court held, should be paid, not because the vessel was wrecked and lost, but because it was not returned.
The transaction is akin to a conditional sale to a charter party for an agreed price on failure to return instead of the value of the vessel at the happening of an event upon which payment is to be made. The damage on failure to return was the price agreed upon for the vessel, but if the vessel had not been so valued in the charter party the damage recoverable would have been the value of the vessel shown by the evidence. See Walls v. Conors (115 U. S., 353, 360) and cases there cited.
The court in effect held that though the actual damages could readily have been ascertained, nevertheless, as the parties had agreed upon the value of the vessel as the measure of damage on failure to return, the contract was upheld.
In referring to that case this court in the Phoenix Iron Co. v. United States (39 C. C., 526, 542) said:
*505 “ It is true that in the above case it was not a question of penalty or liquidated damages, but the transaction is akin to a stipulation as to the damages in case of the nonperformance of an agreement within a specified time.”
In the Morse Dry Dock and Repair Co. v. Seaboard Transportation Co. (161 F. R., 99, 100) the court held that while a default by the defendants would have constituted a waiver of the time limit, the delay was not due to the defendants, but was caused by a strike, and therefore the claimant was liable for damages. The court, however, said that the case followed the decision in McGowan v. American Press Tan Bark Co. (121 U. S., 575), in which only actual damages were involved.
The numerous cases cited by counsel for the Government in his reply brief on a motion for a new trial are, as he concedes, cases in which the court was required to determine whether “ certain provisions of certain contracts were for penalties or for liquidated damages ”; and as to the case of the Phoenix Iron Co. v. United States, supra, there was no question of waiver involved, apparently for the reason that the delays of the Government, as shown by paragraph 2 of finding VIII, were of such a character as to indicate that they were prior to the extension of the contract shown in finding II; but the question as to whether the Government had waived the contract time was not raised, and therefore the effect of such waiver was not passed upon; that is to say, a waiver by operation of law arising out of the delays of the Government in preventing a contractor from the performance of his contract within the contract time.
Now let us notice some of the cases which clearly sustain the decision- of the court as heretofore announced and as herein adhered to:
It was early held in England that the amount of penalty stated in the contract was not conclusive on either party, as the actual damages proven might be more or less, but that liquidated damages bind both parties. (Winter v. Trimmer, 1 H. B. L., 343.) Later, in the case of Wilbeam v. Ashton (1 Campbell, 78), it was held that the damages could not exceed the amount of penalty. However that may be, liquidated damages bind both parties and to be enforceable as such *506 must have a definite date from which to run. (Dodd v. Churton, 1 Q. B., 562; Kemp v. Rose, 1 Griff., 258.) If, however, such contract provides for an extension of time for completion, and such extension be granted, that will fix a different date from that named in the original contract.
Here, however, while specification 11, made part of the contract, provides that an extension of time for the completion of the work can only be granted in writing by the Chief of the Bureau of Yards and Docks, no such extension was granted except by the terms of the first supplemental contract; nor, as therein provided, shall an extension of time “ be implied from any cause under any circumstances.” Hence as the work was not completed within the contract time by reason of the delays of the Government, the time limit was thereby waived and the claimant had a reasonable time within which to perform. (Moore, Receiver, v. United States, 46 C. Cls., 139. See also Dodd v. Churton, supra.) This being true, the definite date from which the liquidated damages were to accrue was eliminated. (Drown v. Ingalls, 3 Wash., 424.)
In the case of King Iron Bridge & Mfg. Co. v. City of St. Louis (43 Fed. Rep., 768, 769), where the claimant had contracted for the construction of a bridge on piers to be prepared by the defendant, with a provision for a fixed sum as penalty per day for delay, and where the defendant had prevented the contractor from performance, the court said:
“ The result is that the provision awarding damages in a given sum, should there be delay in completing the contract, was as effectually eliminated from the contract as if the parties had canceled it by express agreement, and it is wholly immaterial whether we say the provision in question was waived or that the defendant is estopped from insisting on the provision. In either event the result is the same. The city, by its own default, having rendered performance impossible within the time limited, has lost its right to claim the deductions specified in the contract. The law to this effect is well settled and fundamental. (Stewart v. Keteltas, 36 N. Y., 388; Weeks v. McCarthy, 89 N. Y., 566; Starr v. Mining Co., 13 Pac. Rep., 195; Mansfield v. Railroad Co., 6 N. E. Rep., 386; Navigation Co. v. Wilcox, 7 Jones (N. C.), 481; Dumke v. Puhlman (Wis.), 21 N. W. Rep., 820; Jones v. Railroad Co., 14 W. Va., 523.)
*507 “ For an unreasonable delay in erecting the superstructure after the piers were fully completed, whereby the city sustained injury, it might perhaps be entitled to recoup" damages on a counterclaim, but it has not framed its answer on that theory, and no decision on that point is necessary ■ It has planted itself squarely on the contract and insists upon the penalty nominated in the bond, which, for reasons aboye' stated, it is not entitled to.”
In the case of Jefferson Hotel Co. v. Brumbaugh et al. (168 Fed. Rep., 867, 874), where there was a contract providing a penalty for delay in the construction of a building, the performance of which was prevented by the owner through other independent contractors, the court said:
“ It must be conceded, also, that the entire completion by plaintiff of his contract work'was dependent upon these other contracts or some of them being completed first. For these conditions the hotel companjr must be held responsible. The enforcement of penalties are not favored in equity, and they are so enforced only after the demandant therefor has shown that he himself has strictly complied on his part with all the contract requirements prerequisite to such enforcement. It is vigorously urged that the plaintiff contractor in this case, however, was responsible for a large number of the days of delay and the defendant company for only a few of the days thereof, and that the court, under such circumstances, should attempt to ‘ apportion ’ such delay between the two and hold the contractor liable in penalty for those days that it, in its judgment, deems he may be chargeable with. This is just what the courts can not, with any degree of certainty, do, and therefore refuse to do. * * * Therefore the courts have laid down a very salutary rule to the effect that they will not attempt to apportion such delays where the causes thereof have been mutual, but will refuse under such circumstances to enforce the penalty. The law on this matter is well laid down in a series of New York cases, such as Stewart v. Keteltas (36 N. Y., 388), Heckman v. Pinkney (81 N. Y., 211), and Weeks v. Little (89 N. Y., 566).
That the case was followed and applied in the case of Velter Mfg. Co. v. Tygarts Valley Brewing Co. (168 Fed. Rep., 1002, 1005). See also Holme v. Guppy (3 Meeson & Welsby (1838), 387); Findlay v. Cameron (1878), (4 Vict. L. R, 191).
In the case of McGowan v. American Pressed Tan Bark Company (supra) a contractor undertook to install ma *508 chinery on a steamboat within 60 days from the date of the contract, but was prevented by the owner not furnishing the boat until after the time had expired, after which the contractor, without objection, proceeded with the work; and the court held, notwithstanding such delay, that the contractor was bound to do the work within 60 days from the time the boat was furnished, holding, however, that the failure of the owner to have the boat ready excused the contractor from strict performance, the court saying:
“ It is, therefore, claimed by the plaintiff that no damages were included in the verdict on account of the delay in not erecting the machinery within 60 days from June 23, 1881 [date of the contract]. This appears to be a sound proposition. We see no error in the charge of the court, that if the defendants proceeded under the contract they were bound to complete the work within the length of time contemplated by the original agreement and such additional time as was lost by the delay in the construction of the boat. There is nothing in the bill of exceptions to show that the machinery could not have been erected within 60 days after the boat was ready to receive it. The parties treated the contract as in full force, except as to the time in which it was to be performed, and the work was done and the payments were made under the contract as thus extended in time. The defendants made no claim before the suit was brought that the contract was rescinded by reason of the nonreadiness of the boat until the 10th of November, 1881, or that there was any reason in that fact which prevented them from complying with their part of the contract within the 60 days after the delivery of the boat. No such defense is set up by them in their answer, and they introduced no evidence to that effect, so far as the bill of exceptions shows. These views are in accordance with the ruling of this court in Phillips Co. v. Seymour (91 U. S., 646). The plaintiff went on paying the defendants on account for the machinery, and the defendants proceeded in erecting it without complaining of the delay in the furnishing of the boat and without any claim that they were not required to furnish the machinery within the 60 dáys after the furnishing of the boat.” No question of liquidated damages was involved.
That case was followed by the Circuit Court of Appeals, Second Circuit, in the case of Morse Dry Dock & Repair Co. v. Seaboard, Transp. Co. (supra), reversing the District Court, Southern District of New York (154 Fed. Rep., 90). *509 There a contractor engaged to make alterations in a ship and agreed to pay a certain sum as liquidated damages if he failed to complete the work within the contract time. The contract, as found by the District Court, was subsequently modified by a trifling change in the specifications involving less than $200, and the court held that the time fixed for doing the work was not thereby waived, but that the contract time for completion was extended for a sufficient length of time to perform the work. The court, among other things, said:
“ This change was unimportant, and it is manifest that the parties in making it did not intend to modify the time provision in the contract. The-libelant, having agreed to make the change without requiring additional time, can not now urge it as an excuse for the delay. The extra work ordered might have been done at the same time as the contract work and involved no delay in the latter. And the fact that this extra work was done in no way relieved the libelant from its obligation to complete the vessel within the stipulated time. But the question whether the respondent fulfilled its part of the contract and is in a position to claim damages for the delay is a more serious one. It was the duty of the respondent to furnish the windlass to be installed in the vessel. The installation of the windlass required about eight days’ time. And yet the respondent only furnished it on Octiber 11, 1906, the day before the time limit for the complete m of the work. Whatever may then have been the state of tho work, it was obviously impossible to complete it in time.”
It was contended that the delay, however, was not by the respondent but by reason of a strike at the libelant’s yard; and the court, answering this contention, said:
“ The respondent’s contention is based upon an assumption which it had no right to make. The respondent, seeking to enforce the damage clause in the contract, must show that it lived up to the contract itself. It can not assume that its failure to perform its obligations made no difference. It is impossible to say what might have happened had the conditions been different. It can not be said that if the libelant had received the windlass earlier it would not have made greater efforts to hasten the work. The respondent seeking to enforce the contract can not recover damages for delay which may have been occasioned by its own default.
*510 “ Had the failure of the respondent to deliver the windlass been the cause of all the delay — -had the work been waiting for the installation of the windlass when it was delivered— the default of the respondent would undoubtedly have con-stitued a complete waiver of the time provision in the contract. * * * Consequently, while the circumstances are not such that the delay of the respondent operated as a waiver of the time provision in the contract, it did operate as an implied agreement extending the time sufficiently to permit the installation of the windlass.”
No question of liquidated damages was involved therein.
Here the delays due to the Government were not before but after the work began, and thereby the time limit of the contract was waived; and as some of the work was done during the period of delay, there is no basis other than a reasonable time within which to perform. This being true, there is no definite date upon which the liquidated-damage clause of the contract can operate.
Of course where strict performance of a contract is prevented by the Government no claim for penalty or liquidated damages can arise, as the contractor is without fault; and this is the effect of the decision in the case of the District of Columbia v. Camden Iron Works (181 U. S., 453, 461, 464), where, in this respect, the court, quoting from the case of Williams v. Bank (2 Pet., 102), said:
“ If a party to a contract who is entitled to the benefit of a condition, upon the performance of which his responsibilty is to arise, dispense with, or by any act of his own prevent the performance, the opposite party is excused from proving a strict compliance with the condition. Thus, if the precedent-act is to be performed at a certain time or place and a strict performance of it is prevented by the absence of the party who has a right to claim it, the law will not permit him to set up the nonperformance of the condition as a bar to the responsibility which his part of the contract has imposed upon him. * * * If strict performance by plaintiff was prevented or waived by the defendant, as contended on the facts, then the claim for fines or penalties for delay or failure to deliver the pipe could not be sustained.”
In the case of Dannat et al. v. Fuller (120 N. Y. N., 550), cited and relied upon by this court in the Ittner case (48 C. C. Cls., 336, 351), in respect of failure to perform a contract within the specified time, the court said:
*511 “ It. consequently appears to us that the failure of the plaintiffs to perform on their part operated as a waiver of the performance of the contract as to time, and the defendant consequently had the right to perform his part of the contract within a reasonable time after the plaintiffs had completed their part. The allowing of the defendant 30 days additional time in which to complete the contract, as was done in this case by the referee, does not restore the provisions of the contract which had been waived * *
In the later case of Mosler Safe Co. v. Maiden Lane S. D. Co. (199 N. Y., 479, 489), among other things, the court said:
“ Where the parties are mutually responsible for the delays, because of which the date fixed by the contract for completion is passed, the obligation for liquidated damages is annulled and, in the absence of some provision under which another date can be substituted, it can not be revived. If the respondent failed to complete within a reasonable time after crediting the appellant’s delays, then the latter had a cause of action for the former’s neglect, and the measure of damages would be the actual loss proved to have been sustained.”
The court quotes from the case of Willis v. Webster (1 App. Div. (N. Y.), 301-305), with approval, saying where—
“ liquidated damages are to be sustained after a given date, the plaintiff [contractor] is entitled to know with precision when he is laboring under such an obligation, and not be required to leave it to the judgment of a jury as to what is a reasonable time. It is impossible under the contract to apportion liquidated damages. Either the liability for the liquidated damage exists, or it does not. It can not half exist and half be waived. In the case at bar there was a definite contract, which was abrogated by the acts of both parties; and it requires equally concerted action to breathe life into it again.”
If such be the rule where both parties have contributed to the delay in completion, how much stronger should the rule be where the contractor has been hindered by the other party; and if that party be the Government its rights must be determined under the contract according to the rules of law applicable to individuals.
Here the delays of the Government prevented the claimant from a strict performance, and thereby it waived the con *512 tract time within which to perform, and that waiver operated to eliminate the definite date from which to assess liquidated damages; and though the claimant in continuing the work was thereby obligated to complete the same within a reasonable time the liquidated damage clause was not thereby restored and made applicable to an unreasonable time.
It would doubtless be competent for parties to a contract to agree that in case of the waiver of a stipulation as to time, the liquidated damage clause might be continued and made applicable to an unreasonable time. (Mosler Safe Co. v. Maiden Lane S. D. Co., supra.)
Nor can the court look to the liquidated damage clause to determine the actual damages sustained. Sometimes where contracts fail and recovery is sought on quantum meruit for work done or articles of merchandise furnished, the consideration or price fixed in such contract may be considered in determining the reasonable value of the work done or articles furnished (Salomon v. United States, 19 Wall., 17, 20); but can the liquidated damages so agreed upon in this case be considered as the actual loss or damages for nonperformance within a reasonable time when the same were expressed and intended as liquidated damages for the nonperformance of the contract within a designated time? We think not.
' The views here expressed are in harmony with the contract itself, as, by specification 14 thereof, provision is made for deduction from the contract price of “ the amount of any •and every expense to the United States, caused by such delay ”; that is to say, such “ avoidable delays ” as the claimant “ might by care, prudence, or foresight have guarded against or prevented.” And whether the amount of such deduction be regarded as additional to the liquidated damages agreed upon is immaterial, since the provision is independent thereof and applicable to delays beyond a reasonable time as well as to delays beyond the contract time.
Though after September 21, 1903, as set forth in Finding VIII, the claimant unreasonably delayed the work, the Government did not avail itself of the provisions of paragraphs 15 and 16 respecting anulment of the contract. On the contrary, the Government recognized, as found, that the delays *513 had, in the first instance, been caused by the additional work made necessary under the first and second supplemental contracts and the use of the dock for docking vessels while the work was in progress. Doubtless for these reasons the Government did not elect to annul the contract; and while the claimant was permitted to continue the work to completion, it was nevertheless bound to do so within a reasonable time.
Whatever loss the Government may have suffered by reason of the claimant’s breach to perform within a reasonable time must be reduced to actual damages, if any, susceptible of proof. This has not been done and for the reasons stated the claimant is entitled to recover the $6,000 so deducted.
The findings (IX) show that the work was completed and accepted by the Government for tests April 21,1904, and that after tests of the plant, the docking of vessels, and incidental repairs, the plant was finally accepted by the Government April 5, 1905.
Under specification to, made part of the contract, the plant, before being accepted, was to be subjected to “ a full duty test by the contractor under the supervision of the civil engineer in charge.” This obligated the claimant to maintain the plant or pumping station at its own expense during the time necessary to make the test. The reasonable time in which to make the test, however, we have found was only two months, whereas by reason of the use of the dock by the Government for docking vessels and incidental repairs the tests were not completed until April 5, 1905, or about 10 months beyond the reasonable time necessary therefor.
As a result of this delay in making tests the claimant, without its fault, necessarily incurred in maintaining and operating the plant or pumping station, so required by the Government for its benefit, the additional expense of $3,562.35, including 10 per cent profit, for which the claimant is entitled to recover unless the prior delay of the claimant thereby necessitated the delays of the Government, in respect to which the defendants contend that it operated to postpone the time for testing the plant until after April, 1904, by reason of which the Government was compelled during said *514 period to use the docks for docking vessels; that but for the delay of the claimant the machinery could have been installed and the necessary tests and remedies incident thereto made and completed before April, 1904.
From this premise the defendants in effect argue that the additional expense incurred by the claimant in maintaining the plant beyond the time within which the tests could have been made was through its own fault, for which the Government should not be held responsible. We are unable to see the force of this argument. The same reasoning might be applied to the delays of the Government from October 15, 1901, to May 1, 1903, and but for which the claimant might have completed the work for tests by the latter date; and so but for the delays of the claimant thereafter the work would have been completed earlier, but neither delay can be held to justify the Government in requiring the claimant to maintain at its own expense the pumping station for the benefit of the Government beyond the time reasonably necessary for making such tests. To so hold would be subjecting the claimant to an indirect servitude or penalty without proof of loss.
As the claimant’s loss resulting from the Government’s breach requiring the claimant to maintain and operate at its own expense, for the benefit of the Government, the pumping station for tests beyond a reasonable time is shown by competent proof to have been $3,562.35, the claimant is entitled to recover therefor.
This brings us to the items of extra and additional work not abandoned by the claimant for want of proof.
Item 4. Gear casing. — There is no provision in the specifications or contract providing for such casing, and, as under the custom then prevailing such casing or covering was not supplied by the manufacturer, the claimant purchased and installed standard valves without such cases. The valves so installed were intended by the claimant to be opened and closed by a motor operated from a switchboard, so arranged by the claimant that workmen need not be in close proximity thereto. After the installation of these valves and while the work was progressing the defendants built a plank walk across the top of the pipes in the pumping plant for the *515 more convenient use of its workmen, and then, to protect them from the high-speed gearing, the claimant incased the machinery at an extra expense to it of $479.05.
The casing for protection was necessitated by the plank walk built by the Government, for which the claimant was in no way responsible, and the Government having received the benefit thereof the claimant is entitled to recover the amount so expended.
Item 5. Extra files. — Prior to the claimant’s proposal respecting the price to be paid for the work of connecting Dry Dock No. 2 with Dry Dock No. 3, under supplemental contract 876A, the engineer in charge exhibited to the claimant and its subcontractors a working plan dated March, 1892, upon which was indicated the piles theretofore driven hj the Government under another contract, the officer expressing to the claimant and its subcontractors at the time his belief that the piles driven were in place and sufficient to support the work. The claimant, relying on the working plan so exhibited and on the belief of the officer so expressed, and without seeking further information, estimated as a basis for its bid for a less number of piles than it was subsequently required to furnish. The piles so driven were covered with asphalt, and for that reason could not be examined by the claimant to determine their sufficiency without destroying the asphalt as well as the piles themselves.
Though the number, position, length, and character of the piles so driven were known to the Government, or should have been, the officer, in expressing his belief that the piles driven were sufficient to support the work, does not appear to have acted in bad faith, though the claimant may haye relied thereon.
Unless the piles so driven by the claimant are embraced in the contract as necessary to the full and complete performance thereof, the claimant, independent of the belief of the officer so expressed, will be entitled to recover therefor on the ground that they were additional to those required by the contract.
The defendants’ contention-is that they are embraced in the contract, and in support thereof they rely upon that *516 provision of paragraph 4 of supplemental contract 876A, which reads:
“ The suction pipes from the pump pit- will be supported on piles and cross caps, as may be found necessary, well balanced and firmly chocked. After the suction pipes have been put in place the side of the dock shall be restored to its former condition and similar to the sides of the dock over the old suction pipes.”
While the number of piles driven may not have been contemplated by the claimant when making its bid, nevertheless the provision of the supplemental contract referred to was evidently intended to cover the number found necessary for support as well as to complete the work as an entirety.
For these reasons we must hold that the claimant is not entitled to recover on this item.
Item G. Sheet piling. — While the claimant was engaged in the construction of the suction chamber the engineer in charge, to enable the Government to use the docks for docking vessels as well as to enable the claimant to proceed with the work, required the claimant to drive a number of sheet piles around the suction chamber to stop a leak that had developed in the old piling theretofore driven by the Government, for which the «claimant was not responsible, the additional cost of which to the claimant was $323.84.
The question here, as in the previous item, is whether the contract required the claimant to drive the sheet piling or whether the work was necessary to enable the claimant to perform the contract. While the contract does not in terms provide for this work, it appears to have been essential to enable the claimant to proceed with the work, and therefore may be considered as coming under paragraphs 1 and 3 of the specifications, which in substance provide that the declared and acknowledged intention and meaning of the contract is to provide and secure a complete and substantial pumping plant according to the general plans and specifications to the satisfaction of the Chief of the Bureau of Yards and Docks, and that any details omitted from either plans or specifications, the performance of which is necessary to the construction of the work, of which the engineer in charge shall be the judge, “ shall be supplied by the contractor as *517 though fully described and shown, and without additional expense to the Government.” In other words, the driving of the sheet piling was essential to the complete performance of the work, and under the terms and specifications referred to as well as the law governing the performance of contracts can not be considered as extra or additional, and therefore the claimant is not entitled to recover therefor.
Item 7. Night wor7c on new suction chamber. — In the month of September, 1902, to enable the Government to dock thé U. S. S. Maine and other vessels, the claimant agreed with the Chief of the Bureau of Yards and Docks to keep its men, who were engaged in the construction of the suction chamber, on night duty, which it did at an additional cost to it of $636.44.
This item is not seriously contested, since the work was done during the period of delay caused by the Government, and, as the findings show, the work done inured to the benefit of the Government; the claimant is entitled to recover the cost thereof, $636.44.
Item 8. Reconstruction of old suction chamber. — In the performance of the work the civil engineer in charge construed the original contract and supplemental contract 876A as requiring the claimant to build the new suction chamber and also to complete and reconstruct the old chamber, and on appeal the Chief of the Bureau of Yards and Docks sustained the construction of the engineer in charge. The claimant thereafter performed the work, under protest,, at an expense to it of $2,609.73.
Paragraph 73 of the specifications, made part of the original contract, provides, among other things, that—
“ The present suction chamber on the dry dock must be enlarged so as to provide room for the suction pipe to be installed. * * * Sufficient excavation must be done to enlarge the chamber as shown, and proper sheet piles and bearing piles must be driven if required by the civil engineer in charge. The brick retaining walls and invert arches must be rebuilt as shown in a satisfactory manner.”
The supplemental contract “A” (paragraph 4) provides:
“ The suction chamber in Dock No. 3 shall.be enlarged and incased in sheet piling with sufficient bearing piles, brick *518 vault, and concrete bottom similar to the suction chambers now in Dock No. 3; the bottom of the suction chamber will be on the same level as the bottom in the chamber now in place. The brick walls and bottom to be connected with the old chamber, and the present end wall in the old chamber will be removed so as to admit the free and full flow of water to either the new or old suction chamber; the new or enlarged suction chamber will have a large opening for admission of water to the chamber in the side of the dock opposite the new chamber covered by wire grating similar to the opening opposite the old chamber, allowance in size being made for increased size of the new pumping plant.”
The original contract required that “ the brick retaining' walls and invert arches must be rebuilt as shown in a satisfactory manner,” while the supplemental contract (A) in express terms provides that “ this agreement shall be held and regarded as and being supplemental to the aforesaid contract dated September 15, 1900, and shall be subject to all requirements and conditions thereof except as herein provided.” We fail to find any provision therein abrogating or modifying the provision of the original contract requiring the claimant to rebuild “ the brick retaining walls and invert arches ” in a manner satisfactory to the engineer in charge.
The claimant, however, contends that prior to entering into supplemental contract A the engineer in charge as found had stated to it that the old suction chamber was not to be rebuilt; but as all prior negotiations and representations are presumed to be merged in the written agreement we are only at liberty to refer thereto when the language of the written agreement is ambiguous. (Brawley's Case, 96 U. S., 165.) Nor could the court accept the statement as in the nature of a guaranty in the face of the language of the original contract requiring the retaining walls and invert arches to be rebuilt in a satisfactory manner.
That is to say, the statement of the officer, if competent, could not be accepted to vary the terms of unambiguous language. The intention of the parties must be determined from the language of the contracts taken together, and thus construing the same we must hold that the claimant was not required to do more than by the terms of the contracts it was *519 obligated to do, and for these reasons the claimant is not entitled to recover on this item.
Item 12. Additional electric wiring. — During the progress of the work of installing the machinery in the pump pit a dispute arose between the contractor and the civil engineer in charge in respect to connecting the motors with the switchboard. The claimant proposed to furnish copper wire of the size called for by the regulations and standard of the Fire Underwriters’ Association and the custom and practice of the trade, which would have been effective for the purpose and would have cost about $1,375. The wire so proposed to be furnished was rejected, and the contractor was required to furnish copper wire of the size prescribed by the Standard Underground Cable Co., from two and one-half to three times larger in cross sectional area and proportionately more expensive, which the contractor furnished under protest.
The contract does not disclose the character and size of the wire to be furnished, but paragraph 68 of the specifications provides that the “ electric power will be delivered at the switchboard by the Government, and all other connections must be made by the contractor,” thus leaving the contractor to determine under the custom prevailing the size of the wire to be furnished.
In making its bid the claimant estimated on wire in conformity with the regulations and standard of the Fire Underwriters’ Association, and when ready to procure such wire for the purpose it was required by the engineer in charge to furnish the larger wire at the additional cost of $3,833.96.
The question therefore is, What size wire was called for under the contract or the custom then prevailing? The Government contends that, as the contract provides for a complete and substantial pumping plant to be operated by electricity, the size of the wire required was necessary to meet the operations of the motor under the varying conditions mentioned in paragraphs 67 and 68 of the specifications. We are unable to agree with this contention, as the findings show that the size of wire proposed to be furnished by the claimant was in conformity with the standard of the Fire Underwriters’ Association and would have been effective for the purpose, if not so substantial and durable as the larger *520 wire, and for these reasons we think the claimant is entitled to recover on this item.
Brealcage in drain pipes. — During the construction of the pumping plant in October, 1904, as set forth in Finding XI, there were in said navy yard two systems of water pipes, one a fresh-water system connected with the water system of the city of Brooklyn and the other a salt-water system belonging to the navy yard, with both of which systems of supply in the navy yard, as required by the contract, the claimant’s system of priming the pumps in the pump well was connected. The pressure of these respective systems was subject to sudden increase for fire purposes in the salt-water system and to a cessation of use at times in the fresh-water system for city purposes.
In the month of October, 1904, the volute of drain pipe No. 1, being a part of claimant’s priming system, burst as a result of sudden pressure caused by the Government in one or the other of said water systems without notice to the claimant and without its fault. The claimant immediately repaired said break, and to forestall accidents of a like nature in future placed a reducing valve in said priming system. Notwithstanding this precaution, the elbow of drainpipe No. 2 was subsequently broken by like pressure in one or the other of said water systems. Claimant immediately repaired this break, the cost of all which to the claimant was $699.97.
The Government contends that under paragraph 20 of the specifications the claimant is “responsible for the entire work and every part thereof, and for all tools, appliances, and property of every description used in connection therewith.” And further it is therein provided that the claimant “ shall specifically and distinctly assume all risks of damage or injury from any cause to property or persons * * * and to protect and defend the United States against all claims on account of any such damage or injury.”
We do not think the construction contended for by the Government is well founded, as here the findings show that the breaks from the sudden pressure were caused by the Government without notice to the claimant and without its fault. The difficulties thus encountered were not such as claimant in the performance of its contract was bound to assume.
*521 The claimant had not agreed to assume the risks which the Government might impose by acts not contemplated when the contract was entered into, and for these reasons the claimant is entitled to recover on this item the amount so expended, $699.97.
Replacing broken valve. — During the progress of the work the Government, on its own account, installed in the pump pit an electrical heater so near the valve therein that thereby the same became heated, and while in this condition and during a high tide and a western storm in conjunction, the caisson of Dry Dock No. 3 was in danger, and as a precautionary measure the engineer in charge caused said dry dock to be partially flooded to equalize the pressure on said caisson, thus filling the suction pipe leading to the valve with cold water, causing the same to crack, to replace which the claimant expended the sum of $604.
The Government contends that it was the duty of the claimant to have made provision against expansion and contraction caused by changes in temperature, though the contract makes no provision therefor. This contention may be well founded as to ordinary changes in temperature causing expansion and contraction, but not to such extraordinary changes caused by the action of the Government. That is to say, the failure of the claimant to make provision against such extraordinary changes can not be construed as the omission of a detail the performance of which was essential to carry out the intention of the parties. Nor can the difficulty resulting from such omission be considered as one of the risks which the claimant was to assume in the performance of its contract. Flooding the pit to equalize the pressure on the caisson caused by the Government installing on its own account an electrical heater in the pump pit, whereby the claimant was damaged, can not be regarded as a risk which the claimant assumed or which was in contemplation by the parties when the contract was entered into. Therefore the claimant is entitled to recover on this item the sum of $604.
Renovating electrical machinery. — The electrical machinery was delivered at the navy yard some time prior to May, 1903, when the work was being delayed by the Government, but the same could not be installed because the pumps were *522 not in place. The installation of the pumps was delayed for about 11 months after May 1, 1903, because the claimant’s subcontractor was unable to get certain castings necessary for the installation of the pumps.
During most of the period of delay the electrical machinery was stored by the claimant under a shed covered with weather or tar paper, which was not sufficient to protect said machinery from the elements, and it became rusted. As a result of inefficient storage, for which the Government was not responsible, the claimant was required by the engineer in charge to overhaul and renovate the machinery before installing the same.
The Government contends, and we think rightly, that the delay in installing the machinery was not due to the delay of the Government when the machinery was delivered at the yard, but was due to the failure of the claimant’s subcontractor in getting ready the castings necessary for the installation. Furthermore, the renovation of the machinery was not made necessary by the delay of either party, but was from insufficient storage or housing by the claimant, for which the Government was not responsible.
The requirement of the engineer in charge that the claimant overhaul and renovate the machinery to the extent it did before installing same may have been unreasonable, but under the findings we are unable to reach the conclusion that the expense to which the claimant was put was caused by the Government. On the contrary, had the claimant exercised reasonable care in protecting the machinery from the weather, as by paragraph 54 of the specifications he was bound to do, the same would have been in good condition when ready for installation. By paragraph 66 of the specifications the claimant had agreed that “ the design, material', workmanship, and finish of all electrical machinery and appliances must be equal to the best quality of similar machinery and appliances made by the Westinghouse Electric and General Electric Manufacturing Companies.” To meet this requirement, in the opinion of the. engineer in charge, it was necessary to overhaul and renovate the machinery so found to have been rusted from exposure to the weather. For *523 these reasons the claimant is not entitled to recover on this item.
It follows from what we have said that the defendant’s motion for a new trial must be overruled. The motion to amend findings is allowed in part and overruled in part, but the former findings of fact and opinion are withdrawn and modified findings and opinion are this day filed nunc pro tuno as of May 18, 1912, the judgment as then entered to stand. ‘
Howry, J., was not present when this case was heard and took no part in its decision.