Green, Judge,
delivered the opinion of the court:
It appears from the evidence without dispute that during the period of the war between the United States and the Imperial German Government the defendant entered into certain contracts with the plaintiff for the manufacture of 1,199 gun carriages on a cost-plus-fixed-profit basis. These contracts contained a provision whereby they might be terminated by the defendant, and after the active prosecution of the war had ceased the defendant exercised this right in accordance with the provisions of the contract, but authorized the plaintiff to proceed with the contract work to the extent of manufacturing a total of 601 of the gun carriages. This number of the gun carriages was completed by plaintiff and delivered to defendant but a controversy arose as to the amount due and owing to plaintiff. The parties having failed to come to any agreement as to the amount due the plaintiff under the provisions of the contract and the law as applied to such cases wherfe the contract had been terminated by the Government, the plaintiff now brings this suit to recover $703,043.28, which it claims is due under the provisions of the contract and the law as applicable thereto.
The defendant not only denies that plaintiff is entitled to recover anything herein, but under the counterclaims which it has pleaded alleges there is a net balance due to it of $164,326.78, for which it asks judgment.
Of the items for which the plaintiff asks judgment in its petition, the following are uncontested:
(®) Vouchered items_$74, 902. 05
(6) Balance paid Crofoot Gear Works_ 15,473.12.
(c) Erroneous deduction on account of Sharon Iron and Metal Co_ 973. 91
*469 id) Balance due Strong Steel Foundry Co., on accepted material--- $ 3,912. ¿O
(e) Balance due Strong Steel Foundry Co., on account of defective eastings_ 4, 968. 09
(†) Storage rental_ 4,529.31
(ff) Bonus to salaried employees — ^_l_ 14, 614.77
<h) Premium on bond_ 5, 200. 00
Total uncontested__ 124, 573. 35
The following items of plaintiff’s claim are contested:
(i) Redistribution of overhead_$27, 726.17
O') Overhead on rehabilitation cost_I_ 57,523.50
ik) Or, in the alternative, as allowed in the award-$17,194.72
(Z) Interest on materials purchased'for increased facili-ties_ 11,437.38
(to) Interest on material vouchers, paid after delay_ 7, 111. 16
in) Interest on material vouchers not paid_ 3, 000.00
<o) Losses by delay:
(1) Damages due to prevention by Government of contractor’s earning profits fixed by contract- 539,100.00
(2) Or, in the alternative, compensation for delayed occupancy, $107,266.86.
(p) Profit items : ,-
(1) Retained percentage upon profits paid_ 54, 090.00
(2) 10% profit on total cost, including cost of facilities, $99,532.00, claimed only in the alternative in case the allowance of $539,100 is not made as damages for delay.
(3) Or, in the alternative, profit on restoration costs, $10,739.68.
iq) Occupation of plant after completion_'_ 23,296.17
■(»■) Accountants’ cost of preparing claim_ 3,"860. 02
The items of defendant’s counterclaims and set-offs are as follows:
(a) Property transferred to the plaintiff_$144,145.16
(1) Interest thereon to January 1, 1928_ 73,514.03
(5) Liquidated damages___ 48,197.80
(o) Increased facilities not returned to defendant_ 268. 73
(d) Profit paid to plaintiff in excess of that allowable under termination clause of Article IX of contract _ 22, 774. 41
288, 900.13
Of these items, Items (a) and (e) are undisputed.
*470 Plainttef’s Claim; for $54,090.00, Unpaid Portion of Fixed Profit [Item (P) (1)]
The contract between the plaintiff and the defendant provided for the payment by the Government of a fixed profit of $900.00 for each unit (gun carriage) delivered, 90 per cent of which was to be paid upon the certificate of the contracting officer showing delivery and acceptance, and the remainder upon the completion of the contract. This fixed profit was subject to addition or deduction as further j)ro-vided in the contract; and if the contractor was in default he was made liable for liquidated damages and provision was made as to the method of computing the amount thereof which should be deducted from the payments made to plaintiff.
Ninety per cent of the fixed profit on the price of the gun carriages which plaintiff completed and delivered was paid to plaintiff by the defendant, and the remainder, $54,090.00, was withheld, is still unpaid, and plaintiff seeks to recover it. It is conceded by defendant in argument that if plaintiff was not in default this would be a proper item to be considered .and allowed; but defendant insists that plaintiff was in default by reason of failure to deliver the gun carriages in accordance with the terms of the contract.
The contract read:
“ Delivery to begin about April 1, 1918, and to continue at an approximate rate of seven (7) carriages per day, contract to be completed not later than October 1, 1918.”
The first supplemental agreement for the manufacture of additional carriages extended the date of completion of the main contract to October 15, 1918, and subsequent extensions made by defendant allowed the plaintiff 78 days after the time prescribed in the contract. As the last delivery was made June 12, 1919, it is evident that delivery was not made as specified in the contract, even when all extensions are considered. The plaintiff, however, insists that this delay was the fault of the defendant, and even claims that the defendant caused it to lose a total of 527 days in addition to the extensions granted. At this point it becomes *471 necessary to consider the evidence and certain provisions of the contract bearing on these conflicting claims.
The testimony taken in the case fills nearly two thousand printed pages, the greater portion of which relates to the matter of delays alleged to have been caused by the respective parties. This evidence is so conflicting, indefinite, and uncertain, that as to many important points we are able only to come to a negative conclusion that-the evidence is insufficient to form the basis of a finding. It clearly appears that both plaintiff and defendant were responsible for matters that caused serious delay in the performance of the contract, and that there were delays for which neither was responsible, but the precise amount of delay to be apportioned to each can not be determined. Not only is the evidence in the very nature of things uncertain as to the extent of the delay, but ihe testimony given with reference to delays shows that for the most part they were concurrent; that is, while one was operating one or more other causes of delay were also taking place, and often delays caused by both plaintiff and defendant were operating at the same time. This situation renders it impracticable to determine how much effect each had in the way of postponing the final completion of the work, and utterly impossible to apportion delays or make findings of fact as to the amount thereof, caused jointly or severally by the parties. Consequently, at the outset we reach the conclusion that the extent of the delay caused by either plaintiff or defendant can not be determined from the eyidence. For this reason we do not agree with the commissioner’s finding in effect that the delays were largely caused by matters for which the defendant was responsible. Our reasons for this conclusion are more particularly set out hereinafter in discussing the evidence applicable to the various items of the claims of the respective parties.
The contract required the plaintiff to manufacture the articles described therein in accordance with certain specifications and ordnance office drawings, of which 168 were listed in the contract. Some of the work was of an extremely refined and delicate nature and' accurate drawings *472 were needed for its performance. While the contract does not so specify, we think there was an implied agreement on the part of the Government to furnish these drawings, and that without determining whether defendant was required to furnish drawings which in each and every instance were absolutely correct, it can at least be said that the defendant was under obligations to furnish drawings which were reasonably accurate. That it did not do so in many instances is apparent from the evidence. Drawings were furnished, but numerous errors were discovered therein, delaying designs for some of the jigs and fixtures, orders for materials, arid preparation of working drawings. This necessitated a roundabout method of reports to obtain authority for corrections and corrected drawings and delayed manufacture until the corrected drawings could be obtained. (See Finding XVII.) Those errors were found up to about November 1,1918.
In addition to the changes in the drawings and specifications made by reason of errors in those originally furnished, the defendant made changes for other reasons. It should he observed in this connection that many of these changes were made at the request of plaintiff for the reason that when made the work would be expedited and less time would be consumed than would have been taken had the original requirements of the contract been continued. The plaintiff, however, complains of delay caused by difficulty in obtaining information with reference to these changes as well as tó those which were made by reason of errors, and the evidence on these matters is so inextricably intertwined that it is another instance of the difficulty of determining the respective degree or amount of delay to be charged to each party.
A change particularly complained of by plaintiff was in relation to the plans furnished for the fixed spade brace of the carriage, which originally required it to be made of cast steel. So made, the brace proved a failure. Plaintiff was not definitely notified of this failure and the change made necessary until September 26, 1918, when it was directed to use a modified brace to be furnished by the Watertown *473 Arsenal. While a number of the better castings of the brace, as originally designed, were accepted by the defendant, none of the modified braces were furnished until about November 1, 1918, and a large number of them were not furnished until the following year. The defendant had the right under the contract to make changes in the specifications, but we think that when it made changes that created a serious delay, such as was caused in this instance, defendant lost its right to enforce the time limit for the delivery of the carriages. The effect of these changes in the way of requiring additional work and changes in the work already-done is set out in detail in Finding XYI.
Another cause of delay needs to be'considered, which was one for which the defendant was responsible.
In November, 1917, the plaintiff placed an order with the Strong Steel Foundry Company for certain steel castings. Shortly thereafter the Ordnance Department objected to the price fixed by this company, and asked that the order be canceled and placed with the St. Louis Frog & Switch Company. Plaintiff objected, but complied with the request. The inability of the St. Louis Company to furnish the castings promptly as needed resulted in serious delay. A part of the order was replaced with the Strong Company and part also with the Canadian Foundry Company, but it was not until the forepart of November, 1918, that there was a sufficient supply of one of the most important castings — the trunnion bracket — without which the carriages could not be completed, and upon which other work depended. The defendant was under no obligations to furnish this casting, but it can not rightfully complain of delays resulting from its own interference with the operations of plaintiff.
The testimony does not show - how far this action of defendant, delayed the completion of the contract. It appears that there was difficulty in any event in obtaining castings which would pass the test required by the Government and while the Strong Company at first made the better castings, later on the better ones were made by the St. Loui& Company. Wbdle the amount of the delay can not be de~ *474 termined with any degree of exactness, it is quite evident that it interfered with the progess of the work in general and was an important factor in hindering the completion of the work.
It should also be observed that the parties made two supplemental contracts after the expiration of the time limit in the original contract. Each of these contracts provided that except as modified therein, the original contract should remain in full force and effect, and one contract, dated November 12, 1918, provided that defendant should furnish 150 of the trunnion brackets 120-A2. The other and last supplemental contract was dated January 22, 1919, and both of these two last named contracts provided for additional work being done by the plaintiff.
The recuperator was one of the parts which the defendant was bound to furnish and was needed in order to complete other parts expeditiously. The defendant failed to furnish this part in time, and a considerable number of the carriages were made and accepted without it. Lack of space forbids anything .like a complete discussion of this delay, but it may be said that it was serious, although its precise extent can not be determined for many reasons.
For the same reason we do not discuss other changes made by defendant requiring construction work which was not provided'by the contract.
The plaintiff claims that the defendant is responsible for other delays. Some of these claims are well founded and some are not. For example, plaintiff claims that a delay was caused by the failure of defendant to furnish the French drawings. The contract did not require the defendant to furnish these drawings and the delay, if any, by reason of the failure to furnish them promptly was slight.
Without going further on this point we think enough has been shown to make it evident that the defendant, by reason of delays for which it was responsible, by reason of changes from the original requirements of the contract, and by reason of the execution after the date fixed for completion of the work in the original contract of supplemental contracts continuing the original contract in force (to which *475 further reference will be made in connection with plaintiff’s claims for damages), can not use the failure to complete the work within the time limit of the contract as a defense against plaintiff’s claim for the balance of the fixed profit. It is no answer to this to say that the evidence in relation to delays caused by defendant does not definitely fix the time lost thereby. There are numerous and well-reasoned decisions which hold that where there are mutual delays caused by the respective parties to the contract, the courts will not undertake to apportion the delay between the parties. See Caldwell & Drake v. Schmulbach, 175 Fed. 429; Jefferson Hotel Co. v. Brumbaugh (C. C. A.), 168 Fed. 867, and cases cited therein. True, these are all cases in which liquidated damages were asked on behalf of the plaintiff for failure to perform the contract in time, but the principle upon which the decisions are based is exactly the same, viz, that no definite date remains for the completion of the contract. In the first-named case it is said:
“ The law is that courts by reasoh of the very uncertainty, the impossibility to fairly and justly determine the causes of such mutual delays and their effects, will not attempt to apportion.”
In the case of N. Y. Cont. Jewell Filtration Co. v. United States, 55 C. Cls. 288, 296, which like the case at bar was one in which the completion of the contract within a stipulated time was prevented by delays caused by both parties, the court said:
“ It is well settled that in cases where delays have been caused by both parties to a contract and the completion of the contract has thereby been extended beyond the time fixed, the obligation for liquidated damages is annulled, * * *.” and also,
“ * * * the court has no fixed date from which the contract can be enforced, unless the court chooses to enter the domain of guesswork.”
In United States v. United Engineering Co., 234 U. S. 236, 242, in which, like the case-at bar, supplemental contracts were entered into for additional work after the date *476 fixed for completion under the original contract, the court said:
“ But the Government, as well as the claimant, saw fit to go on with the work with no fixed rule for the time of its completion, so that it be reasonable, and the Government required no stipulation in the second and third supplemental contracts as to damages in a fixed and definite sum for failure to complete the work as required.”
and the defendant was held not entitled to recover liquidated damages.
The principle of these cases is that where delays have been caused by both parties, resulting in the work not being completed until after the expiration of the contract period, there is no longer a fixed date for the completion of the contract. For this reason, in the cases cited, the courts refused to allow liquidated damages, having no date from which the time could begin to run; and in the case at bar, there can be no default on the part of the plaintiff based on the ground that the contract was not completed within the period fixed therein. Under the circumstances, the plaintiff was only required to complete the contract within a reasonable time and there is nothing in the evidence to show that it did not make every reasonable effort to expedite the work.
DEFENDANT’S COUNTERCLAIM OF $48,197.80 FOE LIQUIDATED Damages [Deft.’s Item'(B)]
All that has been said with reference to defendant’s plea that plaintiff is not entitled to recover the fixed profit provided by the contract by reason of failure to complete the work within the contract time applies equally to defendant’s counterclaim for liquidated damages, which is based upon the same allegations. If we are correct in the views above stated, it follows that defendant’s counterclaim for liquidated damages can not be sustained and that plaintiff is entitled to recover the unpaid balance ($54,090) on the fixed profit of $900.00 per gun carriage accepted, unless defendant’s claim that owing to the termination of the contract this profit should be otherwise computed in accordance with the provisions of Article IX of the contract is sustained, and this defense will next be considered.
*477 Defendant’s Counterclaim of, $22,774.41 for Overpayment Under Art. IN [Deft.’s Item (D)]; and Plaintiff’s Claim . of $99,532.00 for Underpayment Under Same Article [Item (P) (2)]
The defendant claims that under the provisions of Article IX the plaintiff has already been overpaid in the sum of $22,774.41. The plaintiff, on the other hand, claims that when Article IX is correctly construed it has been underpaid in the amount of $99,532.00. For the purpose of determining the correct construction of Article IX it becomes necessary to analyze its provisions.
The first two paragraphs of this article provide that in case of the termination of the contract by notice from the defendant—
“ the United States shall pay the contractor all costs and obligations of the contractor theretofore incurred and not previously paid, which may be allowed pursuant to Article V hereof, together with the fixed profit herein provided upon all articles previously delivered and accepted'.”
This is perfectly plain and there is no dispute as to its meaning.
The controversy arises over the proper construction of the words “ all cost ” in the two succeeding paragraphs which provide:
“ In addition thereto the United States shall make the following payments under the following condition:
“ In the event that the contractor shall not be in default * * * the contractor shall be paid a sum which, together with all fixed profit theretofore paid, shall be equivalent to ten (10) per cent of all cost which the United States shall have previously paid, and shall then be obligated to pay.”
except the cost of materials and articles purchased by the contractor and not used in making the articles delivered.
The contention of the defendant is that the words “ all cost ” in the paragraph last set out mean the same as “ all costs ” in the preceding paragraph, 'which words are expressly limited to those included in Article Y, and Article V in turn is made more definite by the pamphlet “ Definition of £ Costs.’ ” All costs, as defined and limited by Article Y, *478 amount to $4,691,485.10. See Finding XXIII. The contract having been terminated, if the defendant is correct in the construction of Article IX for which it contends, 10 per cent of that amount would be $469,148.51. The plaintiff has been paid as fixed profits $486,810.00, or :$17,661.49 more than the amount to which it is entitled as defendant construes this article. On the other hand, if plaintiff’s contention be sustained, and the language in the paragraph last quoted is taken literally and applies to “ all cost which the United States shall have previously paid, and shall then be obligated to pay,” the amount thereof is ‘$5,992,970.17, of which 10 per cent is $599,297.02. The total .amount of fixed profit, including what has already been paid and what is to be paid under the rules laid down, in •this opinion, is $540,900.00. It follows that if plaintiff’s construction is correct, there is in addition to the fixed profit due it under Article IX the sum of $58,397.02 ($599,297.02 minus $540,900.00).
The contention of the defendant is based upon the language of Article Y and the amplification thereof in the pamphlet, “ Definition of ‘ Costs ’ pertaining to contracts,” and other provisions of the contract which will be referred to hereinafter. Article Y specifically enumerates the “ elements included in the term £ costs ’ as used in this contract.” They constitute five items which are set out in Finding VII, and do not include the cost of increased facilities which make up by far the greater part of the sum upon which plaintiff claims to be entitled to 10 per cent under the provisions of Article IX.
As before stated, the elements included in the term costs ” as set out in Article Y are further amplified in the pamphlet headed “ Definition of £ Costs ’ pertaining to contracts.” This pamphlet repeats the language of Article Y with reference to the elements included in the term “ costs ” and also provides that:
“ Temporary buildings, machinery, equipment, etc., purchased by the contractor * * * for use in connection with manufacturing the articles contracted for, * * * *479 shall not be classified as direct materials, upon which any percentage of profit shall be paid to the contractor,”
and it may be said that the words “ costs ” and “ cost ” seem to be used in the contract interchangeably.
The contract also recites that:
“ The decision of the contracting officer on all questions of the allowance and determination of cost and the payment thereof shall be final,”
and he did not approve any such allowance. The defendant therefore says that to include any other items than those which are specified by Article V in the list upon which plaintiff can have a percentage of profit is inconsistent with the other provisions of the contract and that the language used in the last paragraph of Article IS must be construed in accordance therewith.
Coming now to the construction contended for by plaintiff, it must be conceded that it is in conflict not only with one but with several provisions of the'contract; but there is an inconsistency in any event no matter which construction is followed.
No construction can be given this paragraph which will be consistent with the other provisions of the contract. It will be observed that the first tw,o paragraphs of Article IS provide for paying the plaintiff the fixed profit to which reference has heretofore been made, and that the next two paragraphs of Article IX apply when the contractor is not in default, and we have already found that it was not in default in any respect. These two paragraphs provide that the contractor shall be paid
“ in addition thereto * * * a sum which, together with all fixed profit theretofore paid, shall be equivalent to ten (10) per cent of all cost which the United States shall have previously paid, and shall then be obligated to pay.”
If defendant’s contention be sustained, instead of being paid anything “ in addition thereto,” the contractor would suffer a deduction from his fixed profit. It is hardly possible that the parties intended, in event the contract was terminated before completion when the contractor had made all necessary preparation to carry it out, that the contrac *480 tor should lose thereby. On the contrary, it is entirely reasonable that the contractor should be paid an additional sum. under such circumstances, and we are at a loss to ascertain why this provision should be in the contract at all if anything otherwise was intended.
General provisions in a contract, when in conflict with particular specifications thereof, following later in the absence of some reason .to the contrary, must yield to the latter.. See 18 Corpus Juris pp. 537, 538, section 501. On the whole, we conclude that by reason of the termination of the contract, plaintiff is entitled to recover $58,397.02 above the-amount of the fixed profit under the terms of Article IX..
Plaintiff's Claim of $10,739.68, as Profit ON Restoration Costs [Item (P) (3)]
The claim of plaintiff for $10,739.68 as profit on the cost of restoring plant, crating, and shipping Government materials must be rejected, as it is only asked in the alternative-in event the claim for profit on total costs is not allowed.
Plaintiff’s Claim of $539,100.00 for Damages Caused by Delay [Item (O) (1)] and Plaintiff’s Claim of $107,-266.86 as Compensation for Delayed Occupancy of its Plant [Item (O) (2)]
The plaintiff also claims $539,100 as damages caused by delays for which the defendant is responsible and which it alleges prevented it from earning the profits which it would have made had it completed the contract and manufactured the whole number of 1,199 carriages within the time limit specified. The plaintiff also asks in the alternative compensation for delayed occupancy of its plant in the sum of $107,266.86. Both of these items are based on the theory that the Government has rendered itself liable by reason of the delay which it caused in the completion of the contract.
The facts in the case are very similar to those in the case of Crook Co. v. United States, 270 U. S. 4. In that case, as in this, the Government reserved the right to make changes and thus interrupt the continuity of the work. The time for *481 the completion of the contract was specified and liquidated damages were fixed for delays on the part of the contractor. The only reference to delays on the part of the Government is in the agreement that if caused by its acts they will be regarded as unavoidable. Plaintiff agreed to accept in full satisfaction for all work done under the contract the contract price, reduced by damages deducted for its delays. In these .respects the contracts in the Crooh eme and the case at bar have the same provisions, and the Supreme Court said in the Crook case, with reference to the fact that no further provision was made regarding delays on the part of the Government, that:
“ We are of opinion that the failure to exclude the present «claim was due to the fact that the whole frame of the contract was understood to shut it out, * *
The Government was undertaking a new and exacting work during war time, when haste was necessary and difficulties were to be expected from the enormous demand ma,de on all of the Nation’s resources. For delays on its part there were certain provisions in the contract. There is much reason •to believe that if anything more was intended there would have been a further provision with reference thereto. It is not necessary, however, to determine whether the rule laid down in the Crook case should be applied herein.
Neither do we find it necessary to pass on the validity of defendant’s contention that this claim is one for anticipated •profits. We think the condition of the evidence affords .ample grounds for its rejection for lack of evidence to support it.
In order that the plaintiff may recover on its claim for profits that it would or might have made, it must establish by a preponderance of the evidence that but for a breach of some of the provisions of the contract, express or implied, it would have completed the contract in its entirety within the time specified together with extensions granted by defendant.
We have already found that there were delays for which the defendant was responsible. Assuming that this constituted a breach of the implied provisions of the contract, *482 it should be observed that there were other causes of delay, more or less serious, acting concurrently with the delays caused by the defendant. For some of these delays, the plaintiff was responsible, and for some neither party was responsible. There were delays for want of power, want of coal, want of materials and parts which defendant had not agreed to furnish, and delays on account of defective' castings when the best obtainable were being received.. There were also delays in completing the plaintiff’s organization extending into the fall of 1918, and delays in manufacturing the jigs and dies. As late as August 3, 1918, a letter written by the president of the plaintiff company showed that it needed thirty-four important machines in order to make an average of seven carriages per day as provided in the contract. These machines were not machines of a special kind to manufacture special parts needed for the carriages. They were machines for work general in its nature, such as lathes, planers, drills, and reamers. How much delay the want of these machines caused can not be determined from the evidence, but it must have been considerable. When we consider all of these various matters which caused delay, the most of which were operating' concurrently, it can be seen how impossible is the task of determining when the plaintiff would have completed the contract in its entirety if there had been no delays for which defendant was responsible. The claim for damages based upon delays for which defendant was responsible must therefore be rejected.
The alternative claim for delayed occupancy in the sum of $107,266.86 must next be considered. The defendant contends that plaintiff was in fact benefited by the continuance of the work, as it was thereby enabled to keep its organization intact during a period when it would have had no-other work. Regardless of whether plaintiff was benefited or not, we think this claim must be rejected. There is no evidence that any other orders or work were tendered to-plaintiff. It was fully paid for all overhead while the work was going on and making a profit besides. In any event, the evidence is too indefinite as to when plaintiff *483 could have finished the contract had there been no default on the part of the defendant. We think also the principle-before stated with reference to the'effect of mutual delays applies to this claim.
Plaintiff’s Claim of $27,726.17 for Improper Distribution of Overhead [Item (I)]
Plaintiff also sets up a claim for $27,726.17 based on the ground that-the overhead was improperly distributed between the work performed for the defendant and certain commercial work that was also carried on. The evidence shows that while the contract was being performed, the distribution of the factory overhead and the general and administrative expense was made jointly by the accounting representatives of both plaintiff and defendant, and in accordance with the definition of cost contained in the contract. Plaintiff submitted vouchers and received payment in accordance with the plan then agreed upon, and not until considerable time had elapsed after the completion of the contract did plaintiff set up a claim for additional compensation upon a different basis. At no time while the work was going on and payments being made was any question raised as to the method used in distributing overhead costs. On this point the mutual interpretation of the contract by the parties thereto is controlling. Walker v. United States, 143 Fed. 685; Joice v. United States, 51 C. Cls. 439, and cases cited therein. Moreover, the evidence fails to show that there is any definite rule for computing this overhead and we are inclined to think that the method used by the Government officials was correct.
Plaintiff’s Claim of $57,523.50 for Overhead on Rehabilitation Cost [Item (J)]
In its petition the plaintiff claimed $57,523.50 as overhead on rehabilitation labor cost after May 31, 1919, being' the date when manufacturing work ceased on the contract. The War Department Claims Board allowed $17,194.72 for the same period, which has not been paid. -Plaintiff now claims that the normal overhead upon both shipping and *484 restoration labor should be 129.00167 per cent, which would make the amount of its claim $55,828.41. The rate allowed by the board on shipping labor was 10 per cent, while on direct labor it allowed 167.64 per cent. There is no definite rule on this subject and the experts totally disagree. Under such circumstances any conclusion must be rather unsatisfactory, but we do. not think that the shipping labor involved in removing the various machines and other property of the Government is the same as ordinary shipping labor, which is merely a repetition of certain acts day after day, and it does not seem to use to be at all reasonable that the kind of labor first specified should be allowed an overhead of only about one-seventeenth of that applied to direct labor. The evidence with reference to the amount assessed for months in which there were charges for shipping showed that the Government contract bore an overhead rate of about 90 per cent. This shipping was, however, irregular, and would not use so large a force. The best estimate we can make for overhead on this shipping labor in clearing out the factory is 60 per cent — a little more than one-third of the rate on the direct labor. Probably this is approximately correct, and computing it on this percentage we find that the plaintiff is entitled to $21,066.53. For this period the award of the Secretary of War allowed on productive labor an overhead of $5,274.17, and an overhead on removal facilities of $8,409.46. Adding this to the $21,066.53 allowed under this opinion for overhead on shipping labor, we have a total for overhead on labor after May 31, 1919, of $34,750.16.
Plaintief’s Claim on $11,437.38 eor Interest on the Cost oe Increased Facilities [Item (L)]
Further claim is made by plaintiff for interest on the cost of increased facilities in the sum of $11,437.38.
The “ Definition of £ Costs,’ ” made a part of the contract by reference thereto, contained a provision that “ the contracting officer will reimburse the contractor for interest paid by it on money borrowed to finance the purchase of materials necessary to complete contracts for the United *485 States.” The plaintiff’s contention is that machinery purchased to increase the manufacturing facilities of the plant would be included within the term “ materials.” The term “ materials ” must be held to have been used in its ordinary significance and meaning. As such, it would not cover machinery, jigs, fixtures, or tools, etc., used for the purpose of converting material into the finished product and constituting increased facilities. We conclude that the claim for interest on the cost of increased facilities must be rejected.
Plaintiff’s Claim of $23,296.17 for Occupation of Plant After Completion of the Contract [Item (Q)]
Plaintiff claims $23,296.17 for the occupation of plaintiff’s plant after the completion of the contract. This is an alto-. gether different claim from the-one' which it made for delayed occupancy of the plant while the work was going on and stands on a different basis. In determining whether it should be allowed, it becomes necessary to consider the provisions of the contract and the state of the evidence.
The contract (Article X) required the contractor to store the Government property, the cost to be paid by the defendant, but not to exceed 10 per cent per annum of the cost of land and buildings used, or a proportion of such cost according to the proportion used. Article II of the fourth supplemental contract also provided that the defendant should have one year, “ after the termination of the present emergency, as evidenced by proclamation of the President ” within which to remove all increased facilities installed under the contract which were the property of the United States, and that until such removal, the defendant would pay therefor a reasonable, dead storage as rental to the contractor.
Plaintiff presented a claim for $4,529.31 to the Boston claims board for storage rental. This claim was based on the provisions above recited, and the board approved the claim in full. The defendant admits that this much should be allowed on the claim. The plaintiff, however, claims that this sum-is insufficient and that the claim is not in fact for storage but for occupation of the plaintiff’s plant by the *486 facilities owned by the Government and used in the contract work, which were not stored because, as it claims, the defendant failed to give any directions either for storage or for removal of the same.
The evidence is conflicting as to which party was at fault with reference to the disposition of the Government’s property after the contract was completed. The defendant had the right to store it and did not. The storage removal would have cost the plaintiff a certain sum, but there is no evidence whatever as to what that sum would have been and there is no way that the court can determine whether anything would have been saved for the plaintiff if the defendant had directed it to be stored. Upon the whole, we think that the finding of the board, based on the provisions of the contract above recited, is as nearly accurate as can be determined from the evidence before us and the claim is accordingly allowed in the sum fixed by it.
Plaintiff’s Claim of $3,860.02 FOR Acoountants’ Cost of Preparing Claim [Item (B)]
No valid theory has been presented on which the claim for preparing the account against the Government can be allowed and we know of none. The claim must accordingly be rejected without considering whether the former Government officials who prepared it were acting contrary to law.
Defendant’s Counterclaim of $73,514.03 for Interest on Value of Property Transferred [Deft’s Item (A) (1)] ; Plaintiff’s Claims of $7,111.16 for Interest on Material Vouchers Paid After Delay, and $3,000.00 for Interest on Material Vouchers Not Paid [Items (M) and (N)]
Plaintiff’s claim for interest on the cost of increased facilities has already been disallowed. As there was a mutual account between the parties, defendant’s claim of $73,514.03 for interest on the value of property transferred to plaintiff will be disallowed, and also the other claims of plaintiff for interest on material vouchers paid after delay *487 ($7,111-16), and interest on material vouchers not paid ($3,000.00).
In conclusion, there are some observations which should he made with reference to the claims of the respective parties. Plaintiff did not make a claim of $539,100 for profits which it would have earned on the contract but for •defendant’s delays until March 30, 1920. The only claim that it had made before which was at all in this line was for loss in earning power on car business in amount of $67,859.10, which claim was abandoned, doubtless by reason of a total lack of evidence to support it. The award of the Secretary of War made' January 17, 1921, overruled the war claims board’s finding that the plaintiff was liable for liquidated damages.
On November 12, 1918, after the expiration of the original contract, the foprth supplemental contract was exe•cuted reciting that the original contract remained in full force and effect, and on January 22, 1919, another supplemental contract was executed which again provided for the provisions of the original contract, except as amended thereby, to remain in full force and effect, and, in the meantime, the notice that only 600 carriages would be required had been served. It is apparent, therefore, that .neither party originally considered that the other had breached the contract in the manner now claimed, and not until long after the work was completed did the plaintiff ■set up its present claim for damages, and the defendant ■conclude that the Secretary of War was wrong in not holding that the plaintiff was liable for liquidated damages. Each party apparently had considered the case as one in which there had been mutual delays, with many delays without the fault of either, and was willing to let the ultimate payment be determined by the provisions of the contract and the work done. But plaintiff refused to accept the award of the Secretary of War and from that time on the claims of the respective parties began to be expanded. Each apparently wanted to have something to set off against the claims that the other was making or was likely ■to make. It should be particularly observed that at no *488 time while the work was proceeding did plaintiff even suggest that the defendant was not complying with its part of the contract, and was making itself liable for damages.. Instead it set up a claim for additional extensions which: it kept increasing from time to time, not merely while the' work was going on but largely after the work was completed, making change after change in its claims, all to-increase the amount of delay which it claims was caused by the defendant. These mattters are not conclusive upon-, either party, but they strongly tend to sustain the conclusions which we have stated above with reference to the-respective claims for damages.
Including the credits to which it is admitted plaintiff is-entitled, the total amount allowed plaintiff in accordance with the foregoing opinion is $271,810.58, and defendant, including admitted credits, is allowed a total of $144,413.89:. It follows that plaintiff is entitled to recover the difference, being the amount unpaid, of $127,396.64, and judgment will be entered accordingly.
Sinnott,. Judge; Moss, Judge; Graham, Judge; and' Booth, Chief Justice, concur.
SUPPLEMENTAL OPINION
Green, Judge,
delivered the opinion of the court:
Both plaintiff and defendant have filed motions for anew trial, the plaintiff, however, seeking only some changes-.in the findings to correct a stenographic error in one and' to make some of the others more definite. Counsel for defendant do not object to the changes in the' findings asked.' by plaintiff, but ask for an additional finding upon a matter which we deem entirely immaterial and insist that the ruling of the court denying interest to the defendant upon the agreed price of property sold to and left with the-plaintiff after the completion of the contract ought to be-reversed. The amount involved in this item of interest being large and the question of its allowance having been barely touched upon in either the former argument or the original opinion, it is thought best to explain more at- *489 length the views of the court thereon,, especially as the matter-is now argued at length by counsel for-defendant.
The rule with reference to interest in the cases which are brought in this court against the Government seems to have been misunderstood. It is' quite true that, with certain exceptions not necessary to mention here, the plaintiff can not recover interest against the Government, when if it were bringing suit in some other court under similar circumstances against a private individual or corporation there would be no question about its allowance. But while the Government has this advantage in the Court of Claims, it is a' mistake to suppose that it can or should be allowed interest on its claims or set-offs against the plaintiff under circumstances which would not justify a court in making such an allowance under the general- rules with reference to interest. In other words, the Government is not allowed interest simply because it is the sovereign power that is setting up its claim, but because under the principles of law relating to interest it is entitlecj to such an allowance in the same manner that a private individual would be under similar circumstances.
Keeping this principle in mind, it will be seen that the cases cited by counsel for defendant in their brief in support of the defendant’s motion for a new trial have no application. In none of the cases cited was there any question as to whether the Government should be allowed interest. In all of them the question was whether the plaintiff nr claimant against the Government could be allowed interest. The question in the case at bar is whether the United States, as defendant, can be allowed interest on the item above mentioned.
A brief reference to the cases cited and relied upon will show that they do not support the position taken by the defendant. In the case of United States v. Verdier, 164 U. S. 213, it appeared that the Government had obtained a judgment against the plaintiff and as a matter of course was entitled to interest thereon; but so far as the debt of the Government to Yerdier is concerned, it was held for several reasons that interest could not be allowed thereon and that *490 the fact that the Government was entitled to interest on its judgment did not alter the situation. In the case of United States v. North American Co., 253 U. S. 330, the North American Company sought to recover not only the value of certain property taken over by the Government but interest thereon from the time when it was taken, and it was held (under the law as it then stood) that no interest could be allowed. The court did, indeed, say that “ in the adjustment of mutual claims between an individual and the Government, the latter has been held entitled to interest on its credits although relieved from the payment of interest on the charges against it,” but this statement clearly has no application to a case where under the general rules with reference to interest the Government was not entitled to have it allowed. It also should be noted that in the Verdier case, sufra, which was cited in this connection, there were mutual claims but there was no mutual account. Instead there was a judgment upon one side and a claim for salary on the other. Boston Sand Co. v. United States, 278 U. S. 41, is simply another case where the only question was whether the plaintiff could be allowed interest on or as a part of damages awarded in an admiralty case. The majority opinion in the case held that such interest could not be allowed and also, as is shown by the part of the opinion quoted by counsel, held that the fact that the United States might be allowed interest in a similar case was not controlling, and that the right of the plaintiff therein to interest was dependent upon the statute under which the suit was brought, which, as the majority opinion construed it, did not authorize the allowance of interest.
Under well-settled rules of law the defendant was not entitled to interest upon the item under consideration: First, because it was merely one out of a large number of items of an unsettled open mutual account between the parties; second, because, although the evidence shoves that the price of the property was agreed upon, it fails to show any agreement as to when it was to be paid, but, on the contrary, taking all of the circumstances together it may be inferred that there was no expectation that payment should be made until there was a settlement of the whole matter in contro *491 versy beween the parties; third, because there is no evidence of any demand for the payment of the agreed price which-would fix the time from which interest might run.
In 33 C. J. 233, section 123, it is said:
“ But it is very generally held that in the absence of a. special agreement as to interest, or as to the time the debt is to be paid, interest should be allowed on such debt only from the time the principal is demanded.”
The cases cited by counsel to show that the Government is entitled to interest are not in point. The one that seems-to be especially relied upon—United States v. United States Fidelity & Guaranty Co., 236 U. S. 512—tends to refute the-position of defendant rather than sustain it, for the Government therein was not permitted to recover interest on the debt for the entire period during which the money sued for was withheld, but only from the time when the obligation became fixed by reason of circumstances arising rendering it unnecessary for the Government to make a demand.
We conclude that the motion of defendant must be overruled and the motion of plaintiff sustained in so far as to make the changes in the findings asked in its motion, to which reference has heretofore been made. Neither party to the action claims that these changes will have any effect upon the judgment rendered.
An order will be entered in accordance with this opinion..
SiNNOtt, Judge; Moss, Judge; Graham, Judge; and. Booth, GMef Justice, concur.