Per Curiam:
In the case of Tucker McClure, et al., v. United States, No. 47268, this day decided, the court had under consideration a contract substantially the same as that involved here. The contract price in the instant case was $6,058,948, the amount of the claim is $6,048.42, and defendant’s counterclaim is for $1,148.47. The bids were opened March 6, and plaintiff’s bid was accepted March 30, 1940, on which latter date a notice to proceed was issued, was received by plaintiffs, and on April 15, 1940, plaintiffs began the performance of the contract and continued the work pending formal execution of performance and payment bonds and the signing of the contract. The contract was signed about August 1, 1940, as of the date of April 3,1940.
The cases were tried on the same theory, and on the basis of and for the reasons set out in Case No. 47268 the same results are announced in the instant case.
Plaintiffs are not entitled to recover, and their petition is therefore dismissed,
*29 Defendant is entitled to recover on its cross action from plaintiffs, jointly and severally, the sum of $1,148.47, and judgment will be entered in that amount, with interest.
It is so ordered.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner George H. Foster, and the briefs and argument of counsel, as follows:
1. Plaintiff, Tucker McClure, an individual, is a citizen of the United States, and the Thompson-Markham Company is a copartnership consisting of George K. Thompson and Fred S. Markham, citizens of the United States, having their principal place of business in the city of Los Angeles, California. The Ludowici-Celadon Company is a corporation having its principal place of business at Chicago, Illinois.
2. Under the date of April 3,1940, plaintiffs entered into contract No. W-6708-qm-95 with the War Department, Quartermaster Corps, for the construction of officers’ and noncommissioned officers’ quarters in the Panama Canal Zone at Fort Clayton, Albrook Field, Corozal, and Fort Kobbe, for a consideration of $5,058,948.
3. Plaintiffs’ bid was dated February 5, 1940. The bid was opened March 6, 1940, and accepted March 30, 1940. On the latter date a notice of award and a notice to proceed were issued by defendant to the plaintiffs.
April 15,1940, upon receipt of the notice to proceed, plaintiffs commenced performance of the contract work and continued the work pending formal execution of the performance and payment bonds and the signing of the contract, the latter being signed as of April 3, 1940, by defendant on or about August 1, 1940.
4. Under date of May 21, 1940, plaintiffs entered into a written subcontract with the Ludowici-Celadon Company, which subcontract recited that defendant’s War Department had accepted plaintiffs’ bid and awarded plaintiffs the contract described in findings 2 and 3, and farther recited that the subcontractor would sell and deliver to plaintiffs the specified roofing tile and tile fittings for the War Department buildings plaintiffs had contracted to construct.
*30 5. Paragraph GC-47 of the General Conditions of said contract, as modified by Addendum No. 5, all of which are incorporated in and made a part of the terms of the contract, contain the following standard provisions with respect to ocean freight adjustments:
Rates for miscellaneous services and supplies obtained from the Government: The current “Departmental Tariff” or “Special Tariff,” or supplements thereto, containing schedules of rates for services and supplies for the departments and divisions of the Panama Canal, will apply to the Contractor and his Subcontractors when the services and supplies are available, unless otherwise provided in these specifications for particular services and supplies. For services and supplies not included in the current “Departmental Tariff” or “Special Tariff,” the current commercial tariff or supplements thereto, containing schedules of rates for services and supplies for shipping and allied interests at the Panama Canal, will apply to the Contractor and his Subcontractors when the services and supplies are available, unless otherwise provided in these specifications for particular services and supplies. Copies of the tariffs mentioned may be obtained from the Office of the Panama Canal, Balboa Heights, C. Z., or Washington, D. C. All rates so quoted are subject to change without notice.
It is understood and agreed that the Contractor’s Bids are based in part upon the freight rates prevailing on the Panama Railroad at the time the award is made and that if such rates are changed at any time during the life of the Contract, thereafter each monthly or other periodic or final payment to the Contractor shall be increased or decreased in the amount of any consequent increased or decreased cost for freight due to increase or decrease in the freight rates actually paid by the Contractor for shipments on account of the Contract during the period to which said payment applies.
6. The Government-owned Panama Railroad Company, which owned and operated the Panama Railroad Steamship Line, was a member of the Atlantic and Gulf/Panama Canal Zone, Colon and Panama City Conference. Its only port of call in the United States was New York City. The Conference was composed of seven lines, including both the Panama Railroad and the United Fruit Company, a private ocean carrier. The Conference adopted one rate schedule *31 applicable to all members so that when the Conference rate was increased, the rate of all members was likewise increased, and whether plaintiffs shipped via the Government’s Panama Eailroad Steamship Line, or another Conference Line, such as the United Fruit Company, the ocean freight rate to Balboa, Canal Zone, was the same.
7. Under date of November 14,1940, the Comptroller General of the United States rendered a decision stating that a standard freight-rate adjustment provision such as is contained in Paragraph GC-47, supra, was not applicable to shipments made over private ocean carriers, but only to shipments over' the Government’s Panama Railroad Steamship Line, also known as the Panama Line.
8. By letter dated July 8, 1941, the Chief of Office, the Panama Canal, informed the Comptroller General that in the early part of 1941 work on important Army and Panama Canal Zone contracts was being delayed due to shipments of essential materials being deferred until facilities of the Panama Railroad Steamship Line were available. At the same time the Chief of Office transmitted a letter from the Acting Governor of the Panama Canal asking whether the standard freight adjustment provisions might be construed to permit the adjustment of contract payments on private steamship lines on the basis of the Conference rates of the Atlantic and Gulf/Panama Canal Zone, Colon and Panama City Conference.
9. Under date of July 16, 1941, the Comptroller General made a general ruling that certain modifications of the provisions of Paragraph GC-47 were permissible, said decision (21 Comp. Gen. 31) being incorporated herein by reference. Accordingly under date of August 1,1941, plaintiffs and defendant amended their particular contract by Supplemental Agreement No. 2 which principally added Paragraph (b) pertaining to services obtained from any ocean carrier. The Agreement provided:
GC-46 (GC-47) Rates: _
_ a. For supplies and services obtained from the Government: The current “Department Tariff” or “Special Tariff” or supplements thereto, containing schedules of rates for services and supplies for the Departments and *32 Divisions of the Panama Canal, The Panama Bailroad and the Panama Bailroad Steamship Line will apply to the Contractor and his Subcontractors when the services and supplies are available, unless otherwise provided in these specifications for particular services and supplies. For services and supplies not included in the current “Department Tariff” or “Special Tariff,” the current commercial tariff, or supplements thereto, containing schedules of rates for services and supplies for shipping and allied interests at the Panama Canal, will apply to the Contractor and his Subcontractors when the services and supplies are available, unless otherwise provided in these specifications for particular services and supplies. Copies of the tariffs mentioned may be obtained from the Office of the Panama Canal, Balboa Heights, Canal Zone, or Washington, D. C. All rates so quoted are subject to change without notice.
It is understood and agreed that the contractor’s bids are based in part upon the freight rates prevailing on The Panama Bailroad at the time the award is made and that if such rates are changed at any time during the life of the contract, thereafter each monthly or other periodic or final payment to the contractor shall be increased or decreased in the amount of any consequent increased or decreased cost for freight due to increase or decrease in the freight rates actually paid by the contractor for shipments on account of the contract during the period to which said payment applies.
b. For services obtained from any ocean carrier: By the submission of a bid hereunder and its acceptance by the United States it is agreed that if any increase or decrease in the ocean freight rates applicable to the articles, materials, supplies or equipment furnished is made by the Steamship Conference operating in the trade involved, or is prescribed by the United States Maritime Commission, the contract price will be increased or decreased accordingly: Provided, That any such increase in the contract price shall not be more than the amount by which the ocean freight charges actually paid exceed the ocean freight charges based on Steamship Conference rates in effect on date of opening bids: And Provided Further, That the delay in Payment of the amount representing any such increase shall not effect the right of the United States to prompt payment discount on the remainder of the contract price.
B. That the Paragraph above shall not apply to shipments sailing from ports of the United States prior *33 to the date of this agreement but shall not effect any provisions, of said contract, heretofore existing.
In all other respects the provisions of the contract shall remain unchanged.
10. The ocean freight charges on roofing tile based on the Conference rates in effect on the date of opening of bids, namely February 5,1940, and until April 17,1940, inclusive, were $0.60 per 100 pounds. The Conference rate was reduced to $0,525 per 100 pounds on April 18, 1940, but restored to $0.60 per 100 pounds on and after August 12,1940.
Subsequent to August 12,1940, plaintiffs, through the subcontractor, shipped approximately eight million pounds of roofing tile via the United Fruit Company, a private steamship carrier and a member of the aforesaid Conference, from New Orleans to Balboa at the $0.60 rate and paid a total of $6,043.42 in excess of what would have been paid if the rate had remained $0,525 per 100 pounds. Of the sum of $6,043.42, $4,894.95 related to shipments made prior to August 1, 1941 (the date of Supplemental Agreement No. 2) and $1,148.47 related to shipments made subsequent to August 1,1941.
11. After the execution of the aforesaid Supplemental Agreement No. 2 the subcontractor as plaintiffs’ representative filed a claim with the Comptroller General for the $6,043.42 paid as a result of shipments made via United Fruit Company vessels at the $0.60 rate without disclosing that the rate in effect on the date of the opening of bids was also $0.60. The claim schedules purported to show that the ocean freight on shipments of roofing tile from New Orleans to Balboa had been increased from $0,525 to $0.60 per 100 pounds and the schedules were supported by bills of lading which showed that subsequent to August 1, 1941, plaintiffs had made the shipments via the United Fruit Company vessels at the rate of $0.60 per 100 pounds which was $1,148.47 in excess of the amount payable if the rate had been $0,525.
An employee of the subcontractor who, as representative of the plaintiffs, presented the claim on behalf of the plaintiffs, and the Comptroller General’s representative in acting on the *34 claim, were not aware of the fact that the ocean freight rate in effect on the date of opening of the bids was $0.60 rather than $0,525 per 100 pounds. The Comptroller General’s representative in applying the provisions of the contract and the supplemental agreement, disallowed the claim for the shipments made prior to August 1, 1941, because they were not made over the Government’s Panama Railroad Steamship Line. With regard to the shipments made after August 1, 1941, on the mistaken assumption that the ocean freight rate in effect on the date of the opening of bids was $0,525 and that the rate had been increased to $0.60 per 100 pounds, the Comptroller General’s representative caused a certificate of settlement dated December 10,1943, to be issued to plaintiffs for $1,148.47. The certificate would not have been issued if the representative had been informed that the ocean freight rate in effect on the date of the opening of bids was $0.60. The certificate was not issued in compromise of the claim. On the basis of this erroneous certificate of settlement so issued, the Finance Officer, U. S. Army, on or about December 21, 1943, paid plaintiffs the sum of $1,148.47 on Government Voucher No. 417286. Plaintiff has not reimbursed defendant for the $1,148.47 and the Comptroller has issued a certificate of settlement correcting the error and certifying that plaintiffs are indebted to the United States for the $1,148.47 erroneously paid. [Amended. See below.]
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiffs are not entitled to recover and the petition is therefore dismissed.
The court further concludes that as a matter of law defendant is entitled to recover on its counterclaim, and it is therefore adjudged and ordered that it recover of and from plaintiffs, jointly and severally, one thousand one hundred forty-eight dollars and forty-seven cents ($1,148.47). [Amended. See below.]
■ Judgment is also rendered against plaintiffs for the cost of printing the record herein, the amount thereof to be entered by the clerk and collected by him according to law.
*35 On defendant’s motion to amend the judgment in this case (No. 47269), which motion was granted, the following opinion was rendered May 13,1953:
Jones, Chief Judge,
delivered the opinion of the court:
The defendant is entitled to interest on the overpayment from the time of maing the demand for repayment, October 15, 1947. United States v. Skinner, 35 F. 2d 889; Standard Steel Car Co. v. United States, 67 C. Cls. 445. However, in the circumstances of this case we think four percent is a reasonable rate.
The judgment will be amended by adding after the figures $1,148.47 a comma and a clause reading as follows: “together with interest thereon at the rate of four percent per annum from October 15,1947, to date of payment.”
It is so ordered.