Littleton, Judge,
delivered the opinion of the court:
The seven items making up plaintiff’s claim of $146,091.60, damages alleged to have been sustained in performance of the contract dated December 2 and executed December 14, 1933, for which it is alleged the defendant is liable, are set forth in finding 13. The first six items of the claim, all involving excess and extra costs and expenses alleged to have been unnecessary and not required by the contract, relate to different items of work and delay and are all more or less related in fact and law as to the grounds upon which plaintiff bases his right to recover. The seventh item of the claim for $15,180.52 with reference to alleged excess cost for local building stone which plaintiff was required to use stands on its own facts.
The contract under which plaintiff’s claim is made was wholly prepared and written by the defendant. Therefore, it should he stated at the outset that under the well established rule of law defenses to acts, conduct, rulings and decisions cannot be sustained where, in order to sustain them it is necessary to resolve all doubts in favor of the party who prepared and wrote the contract and specifications. Callahan Construction Co. v. United States 91 C. Cls. 538, at pp. 611, 612. It should also be stated that where the acts, conduct, rulings and decisions of the designated and authorized officers *136 and agents of one party to the contract in connection with the performance thereof by the other party, are so unreasonable, arbitrary and capricious as to make it. difficult or impossible for the other party to literally comply with some provision of the contract, such other party is relieved from strict compliance and substantial compliance will suffice. In other words, acts and conduct which are abitrary, capricious, or unauthorized and so grossly erroneous as to imply bad faith amount to a breach of the contract or constitute a waiver of strict compliance by the other party. United States v. Gleeson, 175 U. S. 588; United States v. United Engineering & Contracting Co., 234 U. S. 236; Ripley v. United States, 223 U. S. 695; Standard Steel Car Co. v. United States, 67 C. Cls. 445.
Art. 3 of the contract contained the usual provision in Government contracts, that the contracting officer might at any time by written order make changes in the drawings or specifications and within the general scope thereof; that if such changes caused an increase or decrease in the amount due under the contract or in the time required for its performance, an equitable adjustment should be made and the contract modified in writing accordingly; that no change involving an estimated increase or decrease of more than five hundred dollars should be ordered, unless approved in writing by the head of the department or his duly authorized representative, and that any claim for adjustment under that article must be asserted within ten days from the date the change is ordered unless the contracting officer should extend the time, and that if the parties could not agree upon the equitable adjustment to be made in the contract price the dispute should be determined as provided in Art. 15; but that nothing provided in Art. 3 should excuse the contractor from proceeding with the prosecution of the work. No such written changes were made. Art. 15 provided that all labor •issues arising under the contract which could not be satisfactorily adjusted by the contracting officer should be submitted to the Board of Labor Be view. No labor issue within the meaning of this provision arose under the contract. Article 15 further provided that all other disputes as to questions arising under the contract should be decided by the contract *137 ing officer or his duly authorized representative subject to written appeal by the contractor within thirty days to the head of the department concerned or his duly authorized representative, whose decision would be final and conclusive upon the parties as to such questions, and that, in the meantime, the contractor should diligently proceed with the work as directed. Art. 5 of the contract provided that except as otherwise therein provided no charge for extra work or material would be allowed unless the same had been ordered in writing by the contracting officer and the price stated in such order.
Art. 9 of the contract related entirely to termination of the contract and to the matter of liquidated damages at the rate of $175 per day to be paid to the defendant by plaintiff in the event the contract was not completed by plaintiff within the time fixed by the defendant. This Article provided as follows:
That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unfor[e]seeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes: Provided further, That the contractor shall within 10 days from the beginning of any such delay notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of facts thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
This provision does not apply to any of the claims here involved. The contract was completed within the time fixed by the defendant. For that purpose no extension of time was necessary or was made.
*138 The time for completion of the work called for by the contract so as to relieve plaintiff of any liability to de- , fendant for liquidated damages for delay was fixed by the defendant in the invitation for bids and in the specifications, and not by the plaintiff. The contract and specifications contemplated that the work called for by the contract would be completed at the earliest practical date after the contractor had been given notice to proceed. Plaintiff notified the defendant and defendant’s mechanical contractor in writing of his desire and intention to complete the work by Nov. 1, 1934. The mechanical contractor was so notified January 24, 1934. The defendant was so notified as early as March 30, 1934. The contracting officer stated to the plaintiff in writing on April 4 and October 5, 1934 that early completion was desired. The work called for by the contract was completed within the period fixed by the defendant and no question as to liquidated damages to the defendant is involved.
The facts show that in making his bid and in estimating the performance costs for material, labor, and overhead, plaintiff fixed November 1, 1934, as the date when he would complete the work called for by the contract, and the facts further establish that, except for the unreasonable delays in performance caused by the defendant, all the work called for by the contract • would have been completed by plaintiff by November 1,1934,106 days, or three and one-half months earlier than it was completed, and earlier than the period fixed by the defendant for liquidated damages purposes.
The facts established by the record as to the conditions, circumstances, acts and rulings of the defendant’s designated and authorized agents and officers which gave rise to the excess and unnecessary costs and expenses of plaintiff under the first six items of the claim, and the amounts thereof as established by the proof, are set forth in findings 1 to 20 inclusive. Findings 1 to 20 inclusive set forth the facts established by the record as to the first six items, with reference to the acts, conduct, and the requirements and ex-actions of the defendant’s supervising superintendent of construction and his assistant, the superintendent-inspector, *139 wbo were the authorized representatives of the contracting officer, which were unreasonable, arbitrary, capricious, and so grossly erroneous as to imply bad faith. They cannot be any better summarized here. The facts as to the reason for plaintiff’s inability and failure to strictly follow and comply with the literal language of articles 5 and 15 of the contract, and the failure also of the contracting officer to strictly follow those provisions and his complete acquiescence in the course of conduct and procedure adopted and followed by plaintiff in this regard are also set forth in the findings.
Under the facts so established and set forth in the findings, and under the well-established principles of law herein-before mentioned, the plaintiff is entitled to recover as damages the actual increased costs and expenses for materials, labor, and overhead not included in his bid nor the contract price, for work and delay not contemplated or required by the provisions of the contract and specifications and resulting from and caused by the acts of the Government’s authorized agents and officers.
The clear duty rested upon the defendant, acting by and through its agents and officers in charge of the work under the contract, not to delay the contractor in the performance of his work called for by the contract. It was also their duty to cooperate with plaintiff in every reasonable way to the end that the work as called for by the contract might be properly performed and completed as early as practicable so that neither the plaintiff nor the defendant would be put to extra costs or expenses. The proof conclusively shows that plaintiff fully cooperated in every way but that defendant entirely failed to do so. The proof shows beyond doubt that defendant did seriously delay the plaintiff in his performance; that defendant’s officers at the site of the work deliberately and without reasonable cause, delayed plaintiff and deliberately sought to punish him for contesting their instructions, thereby causing plaintiff’s costs and expenses to be greatly increased in certain particulars over the contract price and over what his performance costs would otherwise have been. The acts of the defendant’s supervising superintendent of construction and his assistant, which the con *140 tracting officer could not and did not prevent when properly, under the circumstances, brought to his attention by plaintiff, constituted a violation and breach of the express and implied stipulations and obligations of the defendant under the contract. The decisions are uniform that where the defendant unreasonably delays a contractor it is liable to him for the damages resulting from such delay. The decisions are also uniform that where the defendant substantially contributes to the failure or inability of a contractor to comply strictly with some contract provision, such provision as well as compliance therewith is waived. Standard Steel Car Company v. United States, 67 C. Cls. 445. United States v. United Engineering and Contracting Co., 47 C. Cls. 489, 234 U. S. 236. Especially is this true where the particular provision is procedural and one intended for the benefit of the defendant. Where a contract provides that a contractor shall appeal within 30 days from the decisions or findings of the contracting officer and, as was the case here, the failure of the contractor to so appeal is caused by the acts and conduct of the Government, the contract provision cannot be set up by the Government as a defense. Penker Construction Co. v. United States, 96 C. Cls. 1. In all such express provisions concerning appeals to the head of the department there is clearly implied an undertaking by the Government that its officers will cooperate with the contractor and not be guilty of any act or conduct which will place in the way of a contractor obstacles of such a character as to make it unreasonably difficult or impossible for the contractor to effectively comply literally with the provisions and strictly follow the method expressly outlined. In this case the acts and conduct of defendant’s officers at the site of the, work and the effect thereof were of such a nature that it was impossible for plaintiff to protest in writing each time in the usual way through the officer at site of the work, to get a written ruling from the contracting officer at Washington and then to appeal in writing to the head of the department. The contracting officer realized this and acquiesced in the procedure followed by plaintiff of making prompt and full oral protests to the officers at the site and to the contracting officer *141 and the holding of conferences by the contracting officer and plaintiff for the discussion of such protests.
There is also an implied undertaking on the part of the Government in such provision as Art. 5, hereinbefore referred to, that if work or material not called for by the contract and specifications is required by the authorized representatives of the contracting officer, to be performed or furnished, a written order therefor will be given, and if there is a failure or refusal to give such order and the contractor is forced or compelled by other means, as was done in certain instances in the case at bar, to do such work or furnish such materials, there is a breach of the contract. The contractor is, therefore, not barred from recovering his extra costs and expenses because such work or material was not ordered in writing, and the contract provision cannot be set up by the defendant as a defense to the claim.
Art. 15 of the contract relating to disputes also clearly contemplated and there was, therefore, an implied agreement that the defendant’s designated and authorized representatives, agents, and officers in charge of the work would not interfere with or hinder the contractor in questioning the propriety or correctness of their acts, instructions or requirements during the prosecution of the work and in submitting his protests and objections. Above all, there was clearly implied in such provision an obligation on and undertaking by the defendant not to commit or permit any act intended as punishment of the contractor for so attempting to invoke the contract provision and follow the procedure therein provided so as to obtain a fair and impartial decision of disputes on the basis of a true state of facts and circumstances. Ripley v. United States, 223 U. S. 695; Globe Grain & Milling Company v. United States, 70 C. Cls. 595.
The facts and circumstances established by the proof in the case at bar show that the defendant’s supervising superintendent of construction and his assistant were guilty of acts of punishment and such unreasonable, arbitrary, capricious, and grossly erroneous acts and conduct toward plaintiff and his officers and employees engaged in performance of the work as to make it impossible for plain *142 tiff openly, fairly, and in tbe ordinary manner to protest tbe many acts, conduct, requirements, rulings, and decisions of sucli officers to tbe contracting officer to tbe end that plaintiff might obtain an open, fair, and independent decision from tbe contracting, officer on disputes, between tbe defendant’s agents and officers in charge of the work and tbe contractor. Tbe proof in this case shows that throughout tbe performance of the contract tbe plaintiff, bis superintendent, his foremen, and bis employees endeavored in every way possible to follow and comply with all reasonable instructions, orders, and requirements of the defendant’s supervising superintendent of construction, and his assistant, and that tbe plaintiff and his officers and employees cooperated in every way with the defendant’s officers in expediting the work and in performing it strictly in accordance with the contract and specifications and in accordance with good engineering and construction practice. Plaintiff and his supervisory organization were highly experienced in the type of construction work called for by the contract and there was not at any time any attempt on the part of plaintiff or his representatives in charge of the work not to meet,, fulfill, and comply with all provisions and requirements of the contract and specifications. The plaintiff and his officers and employees were not guilty of any acts or conduct which delayed the prosecution and completion of the work. The plaintiff at all times had on the work an adequate, experienced, and capable force of officers and men, and sufficient and adequate material and equipment for the proper prosecution and performance of the work as called for by the contract and specifications, and for completion thereof by November 1, 1934.
In the early stages of the work under the contract certain disputes and disagreements arose between plaintiff and the defendant’s officers in immediate charge of the work, with the result that the plaintiff protested to the contracting officer. The contracting officer sustained plaintiff’s protests and overruled the instructions and orders of the defendant’s representatives in charge of the work. The facts and circumstances and the subsequent conduct of these officers show that they resented having their instructions protested bv the *143 contractor and overruled. They thereupon entered upon a course of conduct, for which the assistant to the supervising superintendent of construction was primarily responsible, which could only have for its purpose the punishment of the plaintiff, his superintendent, and foremen for objecting to and protesting their orders and instructions. In many respects they became unreasonable, capricious, and arbitrary in their conduct toward and in their orders to the contractor. They acted in such a way as to retard and delay the progress of the work and to cause the contractor unnecessary performance costs and expenses. In many in stances the defendant’s superintendent-inspector with approval of the supervising superintendent, recorded and reported incorrect, misleading and false conditions and facts to the contracting officer in Washington. Plaintiff concluded, and in this he was fully justified, that it would make a very bad situation much worse and that it would be impossible, within the bounds of reasonable limits, to make written protests in each instance through the supervising •superintendent of construction to the contracting officer. In these circumstances plaintiff justifiably concluded that the •best and most practical way of handling the matter of protests and to relieve his superintendent of construction of a task impossible of performance in addition to his other •duties, that two additional capable, experienced, and trusted employees should be sent to and stationed at the site of the work to relieve the superintendent of this impossible burden. This was done. Thereafter these representatives of the plaintiff devoted their entire time to the task of acting ■as conciliators between plaintiff and the defendant’s supervising superintendent of construction and his assistant and, personally to submit to and discuss with the contracting officer in Washington the necessary protests, and to promptly and fully lay before him the conditions and circumstances under which plaintiff was operating at the site of the work. The contracting officer seldom made a definite decision but, after discussion of the matters with plaintiff’s representatives, he stated that there was little that he could do; that he would do what he could and that plaintiff would just have to do the best he could to get along with the defend *144 ant’s officers in charge of the work. In the early period of work under the contract the plaintiff requested the contracting officer to remove the assistant to the .supervising superintendent of construction who acted as defendant’s inspector, because of his unreasonable and arbitrary attitude and conduct, and to place someone else in that position, but the contracting officer declined to do so. This was reasonable request on the part of the contractor and was-justified under the conditions and circumstances which obtained. The contracting officer was misled in many instances by incorrect, misleading and false statements of fact originating with the defendant at the site of the work, of' which plaintiff had no knowledge.
The whole evidence of record taken together shows and we have so found that on all of plaintiff’s protests concerning items 1 to 6 inclusive the final decisions and conclusions of the contracting officer, where he made decisions or reached independent conclusions, were all in favor of plaintiff. The contract certainly did not contemplate or compel the plaintiff to appeal to the head of the department from a decision or conclusion not in writing, or from a favorable decision or conclusion, or to appeal to enforce a favorable ruling.
With these observations and ^conclusions upon the facts-as established by the record, and which apply to the first six items of the claim," these items will be discussed separately.
ITEM ONE
This item of the claim is for extra costs and expenses which the proof shows amounted to $51,249.52 as a result of plaintiff being delayed for a period of more than three months in the completion of the work called for by the contract beyond the date when the plaintiff would, otherwise, have completed the same. The damages claimed and proven under this item for this delay are independent of the excess costs and damages claimed, and hereinafter mentioned under other-items of the claim. The facts with reference to this delay and the increased costs are set forth in findings 14 and 20. ■ The proof shows that the contracting officer delayed unreasonably, either in compelling the mechanical contractor *145 to proceed with his contract with the defendant so as not’ unreasonably to delay plaintiff or in sooner terminating the contract of the mechanical contractor for failure properly to proceed, and to re-let the same so that the plaintiff would not be delayed in the performance of his work. Plaintiff had no control over the mechanical contractor or of the mechanical work which the defendant required to be done and there ivas a clear duty resting upon the defendant to take such action with reference to the mechanical work as might be necessary to avoid any unreasonable delay in the prosecution and completion of the work called for by plaintiff’s contract. The failure and refusal of the mechanical contractor to commence and properly to prosecute the work called for by his contract with the defendant are not chargeable to plaintiff. All that plaintiff could do, or was required, to do, was to inform the contracting officer that his work was ready for the mechanical work and to protest the delay and' call the same to the attention of the contracting officer, which the plaintiff did on numerous occasions in proper time and' in such a way as to enable the defendant to take proper action to have the mechanical work performed and prevent the delay. Plaintiff began to protest this delay in January 1934- and continued to do so until June 26, when the mechanical contractor abandoned his' contract and it was formally terminated. The contracting officer telegraphed and wrote the-mechanical contractor from time to time urging him to commence and proceed with Ms work and called his attention to the fact that the construction work was being delayed by his failure properly to prosecute the work. Early in March 1934, three months before the mechanical contract was terminated, the contracting officer advised the mechanical contractor that his contract would be terminated unless he showed improvement in prosecuting his work. Practically no improvement- was made. The failure of the contracting officer to earlier terminate the mechanical contract may have been and doubtless was influenced by the misleading, incorrect and false reports made to him by the defendant’s inspector that plaintiff was not being delayed by the mechanical contractor but that the mechanical contractor was being delayed' by the plaintiff. But plaintiff had no knowledge of these- *146 reports circumstances. The contracting officer was furnished the true state of facts and conditions by plaintiff. Had defendant made a reasonable investigation into the ability the mechanical contractor to proceed properly with his contract during the early part of the period when he should been engaged upon the work, it would have found that mechanical contractor did not have adequate materials, equipment and finances to carry out his contract. The contract was terminated June 26,1934, when the mechanical contractor advised the contracting officer that he would not be able to proceed with and carry out his contract. At that time considerable portion of plaintiff’s work had been performed and his work was further seriously retarded and delayed notwithstanding the efforts of the bondsmen of the mechanical contractor to get the mechanical work moving and to re-let a contract therefor to another mechanical contractor. In these circumstances' the defendant must, under its contract with plaintiff, answer for the damages, amounting $51,249.52, caused by this delay.
ITEM TWO
The damages of $25,886.84 claimed under this item represent increased costs for material and labor for outside scaffolds by reason of unreasonable, unauthorized, arbitrary, capricious, and grossly erroneous conduct and acts on the part ■of the authorized officers of the defendant in charge of the work. Plaintiff endeavored in every way that could be reasonably required of him, under the contract, to prevent this increased cost, without success. The facts applicable to this item of the claim are set forth in findings 15 and 20. This conduct on the part of the representatives of the Government in charge of the work was brought to the attention of the contracting officer, but nothing was done about it. The amount ■of $10,466.88 of this item of the claim represents the actual cost of material and labor for outside scaffolds around all the buildings which were not called for or required by the contract, and $12,990 represents extra and unnecessary labor costs for brick masons. Plaintiff incurred the extra costs of $25,886.84 in order to overcome an almost impossible con *147 dition and in order to avoid a larger loss and damage by reason of unreasonable, unauthorized, arbitrary, and grossly erroneous action and exactions by the defendant’s officers in charge of the work in connection with the brickwork on the buildings as punishment for the refusal of the contractor to erect the scaffolds when first orally instructed so to do. The defendant’s supervising superintendent of construction refused to give a written order for the scaffolds because he knew that the contract did not require such scaffolding. The balance of the item of $2,429.98 represents the unnecessary and excess costs resulting from unauthorized and unreasonable inspection requirements in connection with mortar joints generally and with reference to brick work under windows and openings in the building, between the time the plaintiff was told that he would have to use outside scaffolds around all the buildings and the time when plaintiff surrendered to the demand and erected the scaffolds in order to avoid the unreasonable and unauthorized requirements in connection with the brick work. Plaintiff is entitled to judgment for the amount of this item of the claim.
ITEM THREE
This item of the claim as established by the evidence is $9,033.21 and represents extra and unnecessary expenses due! to unreasonable, arbitrary, capricious and unauthorized acts and rulings of the defendant’s officers in charge of the work. It is made up of (1) salaries and expenses, amounting to $4,952.95 of two men which it was necessary for plaintiff to station at Roanoke to handle matters arising from the conduct, instructions and orders of the agents of the defendant; (2) cost of $2,620.66 for bolting metal concrete form pans, which bolting was unnecessary and not required by the contract; (3) cost of $1,352.10 for performing certain fine grading work in the basement of certain buildings a second time; and (4) $107.50, extra cost of two-way temperature steel improperly required by defendant’s superintendent of construction to be furnished and installed by the plaintiff.
Upon the facts established by the record and set forth in the findings, plaintiff is entitled to judgment for $9,033.21 for this item of the claim. See findings 16 and 20.
*148 ITEM FOUR
This item of the claim, as established by the proof, in the ■amount of $8,657.05, represents $4,365.12 for excess costs for wages which plaintiff was required to pay certain employees in connection with the placing of reinforcing steel rods by reason of demands by the defendant’s supervising •superintendent of construction as the authorized representative of the contracting officer, and $4,291.93, excess and unreasonable costs and expenses resulting from direct and improper interference with the reinforcing steel work under the contract by the defendant’s officers in charge of the work. The facts established and applicable to this item of the claim are set forth in findings 17 and 20.
This was a Public Works Administration contract prescribed by the Federal Emergency Administration of Public Works and carried out through the office of Director of Construction of the Veterans’ Administration with funds supplied by the Public Works Administration of which the Secretary of the Interior was the Administrator. A reading of the contract, Art. 18, which is set forth in finding 17, the P. W. A. Bulletin 51, P. W. A. Release No. 56 and letter of the Administrator of the Federal Emergency Administration of Public Works, together with a schedule showing the action taken by a committee composed of representatives of the contractors, labor, and borrowers of public funds acting under authority of the Administrator of the Federal Emergency Administration of Public Works, and The Virginia Public Works Advisory Board, shows that plaintiff’s contract contemplated and provided for three classes of labor — namely, skilled labor at a minimum of $1.10; unskilled labor at a minimum of 45 cents an hour; and semi-skilled labor, such as assistants, helpers, apprentices, and serving laborers who work and serve skilled journeymen and mechanics and who were not to be termed as unskilled laborers, at an intermediate rate of wage between the minimum fixed for labor specifically classified as skilled labor and labor specifically classified as unskilled or common labor. Subsection (4) of Art. 18 of the contract, when read in connection with other provisions, seems plain enough on this point, but before *149 making his bid, which necessitated an estimate for the cost of the various classes of labor necessary to perform the work called for by the contract, the plaintiff wrote the Secretary ■of the Interior, as administrator of the Federal Emergency Administration of Public Works, with reference to the matter for an interpretation of the contract labor classification provisions of the contract and of Kelease No. 56 of the Public Works Administration. The Administrator replied that the wage provisions of the P. W. A. contract, under which plaintiff was preparing his bid, anticipated that there would be certain semi-skilled workers who would receive wages in an intermediate grade at less than the rate for skilled workers mentioned; that the Public Works Administration had not predetermined the wage rate for such intermediate grades; that the wage rate set for skilled workers took into consideration the very restricted working week of 30 hours provided by law, and that in setting the wage rate for any intermediate grade the same factor should be taken into 'consideration and that “It is, of course, provided that carpenters’ helpers, etc., should not be classed as common labor.” In making his bid plaintiff took these matters into consideration, as well as the usual, customary and recognized labor classifications, and estimated for the employment and use of certain laborers in semi-skilled classifications at prevailing intermediate rates of wages as customary in the trades, between the minimum prescribed for skilled labor and the minimum wage rate prescribed for common labor. At the beginning of the work plaintiff prepared his schedule of wages showing the skilled, unskilled, and intermediate grades and rates and this schedule was approved by the supervising superintendent of construction as the contracting officer’s authorized representative, and it was posted. Later, as detailed in the findings, the defendant’s supervising superintendent without any justifiable reason and contrary to the usual and customary practice recognized by labor, industry and the government and contrary to the intent and meaning of the provisions of Art. 18 and the ruling of the Administrator of the Federal Emergency Administration, notified the plaintiff that he would not be permitted to use workers classified as semi-skilled labor at an intermediate *150 wage rate between the minimum fixed for skilled labor and that fixed for common labor, and that any worker who was not engaged in performing strictly common labor must be classified as skilled labor and paid $1.10 an hour as a skilled, mechanic. Plaintiff protested to the supervising superintendent and the contracting officer but nothing was immediately done about it. The contracting officer did not make an independent decision on the matter. Neither defendant’s supervising superintendent of construction nor the contracting officer ever regarded or considered the matter of interpretation of the' contract concerning classification of labor-as a labor issue or a matter properly to be submitted to and considered by the “Board of Labor Review” mentioned in Article 15. As set forth in finding 17, the defendant’s supervising superintendent of construction on March 15,1934, wrote a letter addressed to the “Department of Labor, Washington, D. C.,” stating that “there being; orily two scales, shilled and wnshilled labor [on the project],. this office is wnable to determine in which class the reinforcing steel rodmen should be placed,” and asking “your interpretation” as to “whether concrete reinforcing steel rodmen, who fabricate and place reinforcing steel in forms, are considered skilled workmen.” This misleading letter of “submission” started a chain of events which finally resulted in rulings which were followed by the contracting officer which* were unauthorized, arbitrary, and so grossly erroneous as to raise the implication of bad faith. Of course, the bad faith originated with' the office of the defendant’s supervising superintendent of construction, but it permeated every subsequent action and ruling, with reference to intermediate-labor classifications concerning reinforcing steel work, carpentry work and tile and terrazzo work. The contracting-officer finally, as hereinafter set forth under item six, correctly decided the real question involved and correctly interpreted the contract when he held that terrazzo grinding, etc. should be classified under the contract as semi-skilled labor at an intermediate wage rate. But that decision came-too late to be of any value to plaintiff as all of the work in connection with which the question arose had been completed.
*151 On March 20, 1934, one Hollenbeck, the “Administrative Assistant for the Veterans’ Placement Service, Department •of Labor” at Washington, wrote the defendant’s supervising superintendent of construction at Boanoke in reply to his letter of March 20, supra, that “The determination of the Public Works Administration” was “That men classified as steel rodmen (reinforcing) who place, fix, tie, or fabricate steel rods in forms should be considered skilled workmen” .and that the carrying of steel material to the rodmen could and was, usually, done by unskilled labor. This letter did not ■decide or purport to decide the true question involved between plaintiff and defendant. It is perfectly obvious from the letter of March 15, of the defendant’s supervising superintendent of construction, which was written by his assistant, that he positively and definitely decided the question involved and asked for an interpretation on a matter concerning which there was no controversy. There was never any controversy about the fact that if the contract did contemplate and recognize only two labor classifications, reinforcing steel work would have to be placed in the skilled labor •class and not the unskilled or common labor class. Moreover plaintiff was paying the prevailing intermediate wage rate, •and there was no controversy about that. Therefore the dispute between the parties was solely one which concerned the interpretation of the contract, and under Article 15, was one for the independent decision of the contracting officer. But •as above stated he was led astray and did not really decide it until much later. The true question involved was not one for decision under the contract either by the Labor Department or the Public Works Administration, and the so-called ruling of March 20, on a question which was not in dispute was not binding and conclusive on plaintiff. Plaintiff never saw the letter of March 15, from defendant’s supervising •superintendent to the “Department of Labor” and did not at any time have knowledge of its contents and neither did the contracting officer. The contracting officer only saw Hol-lenbeck’s reply of March 20.
Upon receipt of the Hollenbeck letter a day or two later the defendant’s supervising superintendent of construction ¡notified plaintiff that the “United States Department of *152 Labor” bad ruled that men who worked at placing or tying reinforcing steel rods should be classed under the contract as skilled laborers; that plaintiff had violated the labor classification provisions of the contract and that he must pay all men engaged on reinforcing steel work $1.10 an hour and all those who had theretofore been paid at an intermediate rate must be paid the difference between 60 cents an hour, which they had been paid, and $1.10 an hour. Plaintiff still protested the supervising superintendent’s instructions to the contracting officer and a conference thereon was held between the contracting officer and plaintiff. The contracting-officer apparently felt bound by the statements in the letter of March 20, and took no independent action on the matter. See Phoenix Bridge Co. v. United States, 85 C. Cls. 603, 626, 627, 629.
In connection with the work of placing and tying reinforcing steel, plaintiff had on the j ob a -foreman of long experience-in reinforcing steel work, under whose direct supervision and instruction all of the reinforcing steel laborers worked. The Government Employment Office, at Koanoke, Virginia, from which plaintiff obtained his laborers in accordance with, the provisions of the contract, was unable to supply skilled mechanics for reinforcing steel work but that office was able to and did supply workers who had had sufficient experience in this type of work to qualify them for classification for semi-skilled work. They were able to do the work for which they were furnished. But when it was ruled that plaintiff could only use skilled mechanics on this work plaintiff had to let many of the men go. (See letter of April '25, 1934, of contracting officer, finding 17).
There is no evidence whatever in this record to show who, in the Public Works Administration in Washington, made the statement which the administrative assistant for the Veterans Placement Service in the Department of Labor, at Washington, transmitted by letter of March 20, to the supervising superintendent of construction on the basis of which plaintiff was required to classify reinforcing steel work as skilled labor and to pay reinforcing steel workers at the rate of $1.10 an hour. It would appear that because the answer to the question as submitted in the letter of March 15, *153 was so obvious the matter was not given serious consideration by either the Department of Labor or the Public Works Administration inasmuch as it was handled by the Veterans’ Placement Service in the Department of Labor. No one connected with plaintiff’s contract knew or now knows from whom Hollenbeck got the information which he transmitted to defendant’s supervising superintendent of construction. Whoever passed upon his request as stated in the letter of March 15, had to assume that only two grades or classifications of labor were authorized by the contract (which was the sole question in issue) and if this had been true there would have been justification for the statement transmitted to the defendant’s representative. Plaintiff never paid nor claimed that men engaged on reinforcing steel work should be paid at the common-labor minimum wage rate. There was at one time subsequent to March 20, an allegation by defendant’s supervising superintendent’s assistant that plaintiff had paid some of the reinforcing steel workers the common labor wage rate of 45 cents per hour, but this was not true. The action, for which defendant is responsible, as to the manner in which the labor classification question was disposed of and enforced, was arbitrary, capricious, and so grossly erroneous as to imply bad faith.
Counsel for the defendant contend that plaintiff is barred from recovering on this and other similar items because he did not submit the matter of whether the contract authorized the use of an intermediate grade of labor at an intermediate wage rate to the Board of Labor Beview for decision. But we think this contention is without merit for the reason that the question involved was not a labor issue within the meaning of Art. 15 and Art. 18 (f), but was simply a question whether the contract contemplated and, therefore, authorized the use of an intermediate grade of labor at an intermediate minimum wage rate. This question had already been considered, decided, and settled by the Administrator of the Federal Emergency Administration of Public Works six months before the defendant’s supervising superintendent of construction and his assistant conceived the idea in March 1934 that they would force plaintiff to pay all employees not clearly falling within the common labor class the minimum *154 wage rate of $1.10 an hour provided for skilled mechanics. Moreover, neither the contracting officer nor the supervising superintendent ever considered the question one for submission to the Board of Labor Review, and even if the question had been one proper for submission to the Board of Labor Review, it was the duty of the defendant to submit it to the Board since it was the defendant, and not the contractor or labor, who raised the question. The contract (Art. 15) did not provide that “all issues concerning labor” shall be ■decided by the Board. Instead it provided that “all labor issues which, cannot he satisfactorily adjusted by the contracting officer shall be submitted” to the Board. The contract was wholly written by defendant and any doubt that might exist as to whether plaintiff should be held barred, because the real question was not submitted to the Board, must be resolved against the defendant. The common understanding of a statement that an issue shall be submitted to a certain tribunal without indicating who shall submit it is that the person who raises the issue shall be the one to submit it.
Plaintiff is entitled to recover $8,651.05 under this item of the claim.
ITEM FIVE
This item of the claim as established by the evidence is $26,354.19 and represents the difference between the intermediate minimum prevailing wage rates of 60 and 65 cents an hour fixed and paid by plaintiff for semi-skilled carpentry work and the minimum of $1.10 an hour which the defendant compelled plaintiff to pay for such work. See finding 18. This item of the claim is governed by what has been said under the preceding Item 4. What has been there said is applicable here. Plaintiff is entitled to judgment.
ITEM six
This item of the claim as established by the proof is $9,730.27 and represents the difference between the intermediate prevailing minimum wage rate paid by plaintiff’s subcontractor, the Roanoke Marble & Granite Co., Inc., for labor of a semi-skilled classification and the minimum of $1.10 an hour which the defendant compelled that contractor to pay for such semi-skilled labor on the same grounds, for *155 the same reasons and under the same circumstances as set. forth under Item 4 above. See finding 19. The only difference between this item and the preceding items 4 and 5 is-that the contracting officer finally decided the question in-favor of the contractor as he had contended all along as to all-three of the items. In other words the contracting officer decided and ruled in writing on January 14, 1935, that the contract did contemplate, and provide for intermediate classifications of labor at a minimum wage rate between that fixed for skilled labor and unskilled or common labor. However, plaintiff was not reimbursed for the excess cost which he had been ordered to pay. Plaintiff is entitled to judgment for the amount of this item.
ITEM SEVEN
Under this item of the claim plaintiff seeks to recover $15,180.52 on the ground that the contract and specifications-provided for the use of “commercial” sandstone and that the-contracting officer required plaintiff to use silica sandstone locally available and acquired, which, it is contended, was-not sandstone within the meaning of the specifications.
The facts with reference to this claim are set forth in finding 21. The specifications provided that “Stone work indicated on drawings as rubble shall be a random broken range ashlar * * * local sandstone, as hereinafter specified. * * *. All rubble or broken range ashlar stone work shall be a local sandstone of a buff color, with a variegated run of quarry color, the darker shades predominating.” When making his bid plaintiff assumed that there was available locally a soft sandstone that could be easily sawed into shape. Without making any investigation with reference to the matter, plaintiff wired a man near Eoanoke, who, plaintiff had been advised, owned a quarry, for the price which he could supply sandstone. Plaintiff received a reply quoting a price. Plaintiff made his bid accordingly. Plaintiff further assumed that the price quoted contemplated delivery of the sandstone at the site of the work. Later, after the contract with defendant had been made, plaintiff' found that the owner of the stone had no operating quarry,, that the stone was covered with overburden and that the- *156 price which, had been quoted to him was for unquarried stone. Plaintiff further found that the local stone was not the kind of sandstone which he had in mind when he made his bid; that the only stone which could be obtained locally was too hard and abrasive to be worked with a saw but had to be split or cut into proper shape and thickness with other tools. Plaintiff protested being required to use this stone and endeavored to have the contracting officer allow him to use Tennessee or Ohio brown sandstone which was of a softer grade and could be sawed and more easily cut into shape, •which stone, the proof shows, could have been purchased by plaintiff and delivered on the job at a cost of $15,180.52 less than it cost plaintiff to quarry, haul, and cut the local sandstone.
The proof is not sufficient to justify the allowance of the whole or any part of this item of the claim. The contract did not call for “commercial sandstone” as that term may have been understood by plaintiff. It called for “local .sandstone.” There are several grades of sandstone. The •proof is not sufficient to show that the local stone which plaintiff was required to use did not come within the definition of the word “sandstone” or that it was not sandstone ■within the meaning of the specifications. The definition of the word “sandstone” in petrology, as given in Webster’s New International Dictionary, is “a sedimentary rock consisting of sand, usually quartz, more or less firmly united by some cement, as silica, iron oxide, or calcium carbonate. Sandstones vary in color, being commonly red, yellow, brown, .gray or white.” There was no soft sandstone of the character which plaintiff had in mind to be found locally.
The proof does not show what portion of the $08,614.32, which it cost plaintiff to unburden, quarry and deliver the local sandstone to the site of the work, represented the cost ■of uncovering and quarrying the stone which he did not contemplate he would have to do. Plaintiff is not entitled to recover on this item of the claim.
Judgment will be entered in favor of plaintiff for $130,-•911.08. It is so ordered.
Jones, Judge; and Whaley, Chief Justice, concur.
Whitaker, Judge, took no part in the decision of this case.